UNITED STATES DISTRICT COURT
DISTRICT OF MAINE

| | | |
|---|---|---|
| BRENDA PIPPIN, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | 2:14-cv-00167-JAW |
| | ) | |
| BOULEVARD MOTEL CORP., | ) | |
| | ) | |
| Defendant. | ) | |
| _____ | ) | |
| GRACE PARKER, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | 2:14-cv-00169-JAW |
| | ) | |
| BOULEVARD MOTEL CORP., | ) | |
| | ) | |
| Defendant. | ) | |
| _____ | ) | |

**ORDER GRANTING DEFENDANT'S
MOTION FOR SUMMARY JUDGMENT**

Brenda Pippin and Grace Parker brought separate lawsuits under the Maine Human Rights Act (MHRA) and Maine Whistleblower Protection Act (MWPA), alleging that Boulevard Motel Corp. (Boulevard Motel), their former employer, wrongfully retaliated against them. Boulevard Motel has moved for summary judgment on the ground that each former employee's claim falls under the "job duties" exception to these Acts. Despite reservations about the scope of and policy behind the "job duties" exception, the Court has applied the latest teaching from the First Circuit Court of Appeals, and having resolved issues regarding the disputed record,

the Court concludes that there are no genuine disputes of material fact that require jury resolution on either claim and that Boulevard Motel is entitled to summary judgment on each.

## I.  STATEMENT OF FACTS

### A.  Procedural History[1]

On March 21, 2014, Brenda Pippin and Grace Parker, former employees of Boulevard Motel, filed separate, simultaneous complaints in Cumberland County Superior Court for the state of Maine against Boulevard Motel. *Decl. of Michelle Y. Bush* Attach. 2 *Compl.* (ECF No. 3). They alleged that Boulevard Motel committed various violations of state and federal law by terminating them. *Id.* Specifically, Ms. Pippin alleged (1) two counts of unlawful retaliation under the MHRA; (2) one count of adverse employment action for activity protected by the MWPA; and (3) gender discrimination in violation of the MHRA. *Id.* ¶¶ 17-34 (*Pippin*, 2:14-cv-00167-JAW) (*Pippin*). Likewise, Ms. Parker alleged the same three violations of law as Ms. Pippin, and also alleged (1) age discrimination in violation of the MHRA, and (2) age discrimination in violation of the Age Discrimination in Employment Act (ADEA). *Id.* ¶¶ 17-48 (*Parker*, 2:14-cv-00169-JAW) (*Parker*). Boulevard Motel removed both cases to this Court on April 22, 2014. *Notice of Removal* (ECF No. 1). On May 2, 2014, Boulevard Motel filed its Answer to each Complaint. *Answer to Compl.* (ECF No. 5).

---

[1]     Each Plaintiff's case has a different docket number, and not all filings are under the same ECF number for each case. Thus, when a filing has the same ECF number under each docket number, the Court's reference to the ECF number relates to both cases, but when a filing does not have the same ECF number, the Court has specified the ECF number and the related docket number or Plaintiff.

On January 13, 2015, the Plaintiffs moved to dismiss certain counts in each Complaint without prejudice. *Am. Notice of Voluntary Dismissal of Count III, or in the Alt., Mot. to Dismiss Count III* (ECF No. 23) (*Pippin*); *Am. Notice of Voluntary Dismissal of Counts III-V, or in the Alt., Mot. to Dismiss Counts III-V* (ECF No. 23) (*Parker*). The Court granted their motions on February 20, 2015. *Order on Mots. to Dismiss* (ECF No. 31). Each Plaintiff now brings one count of whistleblower retaliation under the MWPA and one count of retaliation under the MHRA.

On February 27, 2015, Boulevard Motel filed a motion for summary judgment as to both Ms. Pippin and Ms. Parker with a supporting statement of material facts. *Def.'s Mot. for Summ. J.* (ECF No. 32) (*Def.'s Mot.*); *Def.'s Statement of Material Facts* (ECF No. 33) (DSMF). Ms. Pippin and Ms. Parker responded to Boulevard Motel's motion and its statement of material facts, and filed a statement of additional material facts on March 16, 2015. *Pls.' Mem. of Law in Opp'n to Def.'s Mot. for Summ. J.* (ECF No. 39) (*Pls.' Opp'n*); *Pls.' Opposing Statement of Material Facts* (ECF No. 40) (PRDSMF); *Pls.' Statement of Additional Material Facts* (ECF No. 40) (PSAMF). On March 26, 2015, Boulevard Motel filed a reply to Ms. Pippin and Ms. Parker's response and to their statement of additional material facts. *Def.'s Reply in Support of Summ. J.* (ECF No. 42) (*Def.'s Reply*); *Def.'s Reply to Pls.' Statement of Additional Material Facts* (ECF No. 43) (DRPSAMF). Finally, on June 4, 2015, the Court heard oral argument. *Minute Entry* (ECF No. 45).

## B.    Factual Background[2]

### 1.    The Parties and the Plaintiffs' Job Responsibilities

Boulevard Motel Corp. was the owner and operator of the Comfort Inn Hotel in South Portland, Maine ("Comfort Inn") in 2010 and 2011.  DSMF ¶ 1; PRDSMF ¶ 1.

Plaintiff Brenda Pippin was employed by Boulevard Motel as the Executive Housekeeper at the Comfort Inn.  DSMF ¶ 2; PRDSMF ¶ 2.  Ms. Pippin worked at the Comfort Inn for over twenty-four years, though Boulevard Motel did not own or operate the Comfort Inn during that whole time period.  PSAMF ¶ 1; DRPSAMF ¶ 1. She worked initially as a housekeeper for two years, then in laundry for approximately three years, and then became Executive Housekeeper.  *Id.*[3]  As Executive Housekeeper, Ms. Pippin was in charge of the housekeeping department and had responsibilities relating to hiring, firing, supervising and disciplining

---

[2]     Keeping with "the conventional summary judgment praxis," the Court recounts the facts in the light most hospitable to Ms. Pippin and Ms. Parker's case theories consistent with record support. *Gillen v. Fallon Ambulance Serv., Inc.,* 283 F.3d 11, 17 (1st Cir. 2002).

[3]     Plaintiffs' paragraph 1 originally stated that Ms. Pippin "was employed for over 24 years by Defendant as the Executive Housekeeper at the Comfort Inn."  PSAMF ¶ 1 (citing PRDSMF Attach. 2 *Decl. of Brenda Pippin* ¶ 3 (*Pippin Decl.*)).  Boulevard Motel submitted a qualified response, noting that it "did not own or operate the South Portland Comfort Inn" when Ms. Pippin began working there, and Ms. Pippin "worked initially as a housekeeper for two years, then in laundry, then again as a housekeeper before being given the title of Executive Housekeeper."  DRPSAMF ¶ 1 (citing *Dep. of Brenda Pippin* 4, 14-15 (ECF No. 34) (*Pippin Dep.*)).  The Court reviewed the record citations and concludes that (1) Ms. Pippin worked for the Comfort Inn for over twenty-four years, *Pippin Decl.* ¶ 3, which included some time where the Comfort Inn was owned by Boulevard Motel, but she did not work for the "Defendant" (i.e., Boulevard Motel) for over twenty-four years, *Pippin Dep.* 14:3-14; and (2) Ms. Pippin was not the Executive Housekeeper during that entire time period, as she first worked as a housekeeper for two years, then laundry for approximately three years, and then became Executive Housekeeper.  *Id.* 14:15-15:7.  The Court altered Plaintiffs' paragraph 1 to reflect these points, and deems the paragraph, as altered, admitted.

housekeeping employees. DSMF ¶ 3; PRDSMF ¶ 3. Ms. Pippin supervised Grace Parker and housekeeper Abinair Martin, among others. DSMF ¶ 12; PRDSMF ¶ 12.

Plaintiff Grace Parker was employed by Boulevard Motel as the Assistant Executive Housekeeper at the Comfort Inn. DSMF ¶ 4; PRDSMF ¶ 4. Ms. Parker worked for the Comfort Inn for eleven years (starting in 2000), beginning first as a housekeeper and laundry aide before becoming Assistant Executive Housekeeper several years later. PSAMF ¶ 2; DRPSAMF ¶ 2.[4] As Assistant Executive Housekeeper, Ms. Parker had supervisory duties and was responsible for performing Ms. Pippin's responsibilities when Ms. Pippin was not at work, including overseeing daily tasks of the housekeeping staff, except Ms. Parker was unable to hire, fire, or discipline housekeeping employees. DSMF ¶ 5; PRDSMF ¶ 5;[5] PSAMF ¶ 3; DRPSAMF ¶ 3.[6] Ms. Parker supervised Abinair Martin when Ms. Pippin was not at

---

[4]    Plaintiffs' paragraph 2 originally asserted that "Ms. Parker worked for 11 years as the Assistant Executive Housekeeper at the Comfort Inn." PSAMF ¶ 2 (citing PRDSMF Attach. 1 *Decl. of Grace Parker* ¶ 3 (*Parker Decl.*)). Boulevard Motel interposed a qualified response, explaining that Ms. Parker initially worked as a housekeeper when she started in 2000, and then in laundry "before becoming Assistant Executive Housekeeper a few years later." DRPSAMF ¶ 2 (citing *Dep. of Grace Parker* 8-9, 15-16, 18-20 (ECF No. 35) (*Parker Dep.*)). The Court reviewed the record citations and concludes that (1) Ms. Parker worked for the Comfort Inn for eleven years, beginning in 2000, *Parker Decl.* ¶ 3; *Parker Dep.* 15:12-16; and (2) although confusing whether Ms. Parker worked first as a housekeeper and then in laundry or vice versa, or worked both at the same time, the Court concludes that Ms. Parker worked as a housekeeper and as a laundry aide several years before working as the Assistant Executive Housekeeper. *Parker Dep.* 8:25-9:3, 16:1-3, 18:18-19:12. The Court altered Plaintiffs' paragraph 2 to reflect these points, and deems the paragraph, as altered, admitted.
[5]    Plaintiffs interposed a qualified response to Boulevard Motel's paragraph 5 on the basis that while Ms. Parker "assumed Ms. Pippin's work duties when Ms. Pippin was not working, she did not have any of the responsibilities incumbent to a supervisor's position; she was unable to hire, fire, or discipline employees." PRDSMF ¶ 5 (citing *Parker Dep.* 21:18-22:4; *Tr. of Dep. of Ignacio Mello* (*Mello Dep.*) Attach. 11 *Ex.* 13 (ECF No. 36)). Having reviewed the record citations, the Court included that Ms. Parker did not have the authority to hire, fire, or discipline housekeeping employees, and deems the remainder of Boulevard Motel's paragraph 5, as altered, admitted.
[6]    Plaintiffs' paragraph 3 originally stated: "While Ms. Parker oversaw daily tasks of the housekeeping staff while Ms. Pippin was out, she did not have the authority to hire, fire, or discipline employees." PSAMF ¶ 3 (citing *Parker Decl.* ¶ 5). Boulevard Motel admitted that Ms. Parker never had authority to hire or fire, even in Ms. Pippin's absence, but interposed a qualified response, arguing

work, but Ms. Parker did not have the authority to fire or discipline Ms. Martin. DSMF ¶ 13; PRDSMF ¶ 13.[7]

## 2.    Sexual Harassment Policy and Training

Ms. Pippin and Ms. Parker each received annual training entitled, "Preventing Sexual Harassment Supervisor Version."  DSMF ¶ 6; PRDSMF ¶ 6.[8]  That annual training instructed supervisors such as Ms. Parker and Ms. Pippin to immediately report employee complaints of sexual harassment according to the reporting

---

that Ms. Parker "supervised housekeeping staff when Pippin was absent, including signing written discipline as a 'supervisor.'"  DRPSAMF ¶ 3 (citing *Parker Dep.* 20-21, 139-40, 157; *id.* Attach. 35 *Ex.* 35; *Pippin Dep.* 179-80; *Tr. of Dep. of Beth Landergren* 106 (ECF No. 37) (*Landergren Dep.*); *id.* Attach. 27 *Ex.* 32).

      Having reviewed the record citations, the Court concludes that Ms. Parker supervised housekeeping staff when Ms. Pippin was absent, which included overseeing daily tasks of the housekeeping staff.  *Parker Decl.* ¶ 5; *Parker Dep.* 21:11-17, 157:17-19.  The Court included these points in Plaintiffs' paragraph 3.  As for the question of whether Ms. Parker could discipline employees in Ms. Pippin's absence, Exhibit 35 is a December 2010 written reprimand of Abinair Martin, which includes Ms. Parker's signature next to the line for "Supervisor's Signature."  *Parker Dep.* Attach. 35 *Ex.* 35 at 1-2.  However, other evidence in the record indicates that Ms. Parker had no authority to discipline employees.  *Parker Dep.* 21:25-22:4 ("Q. Did you issue discipline to staff?  A. No.  Q. Could you have issued discipline if you wanted to?  Did you have the authority to?  A. No"); *Parker Decl.* ¶ 5 ("I did not have the authority to hire, fire, or discipline employees").  The Court is required to draw all reasonable inferences and resolve all genuine factual disputes in favor of the Plaintiffs, *ATC Realty, LLC v. Town of Kingston, New Hampshire*, 303 F.3d 91, 94 (1st Cir. 2002), and having done so, finds that Ms. Parker did not have the authority to discipline employees.

[7]    Plaintiffs submitted a qualified response, admitting that "Ms. Parker oversaw Ms. Martin when Brenda Pippin was not there," but clarifying that Ms. Parker did not have the authority to discipline or fire her.  PRDSMF ¶ 13.  The Court included that Ms. Parker did not have the authority to fire or discipline Ms. Martin, and deems the remainder of Boulevard Motel's paragraph 13, as altered, admitted.

[8]    Plaintiffs interposed a qualified response, admitting that Ms. Parker participated in the "Supervisor Version" training identified by Boulevard Motel, but clarifying that "Ms. Parker was not authorized to hire and fire, and did not consider herself a manager or supervisor in the technical sense.  She was 'Brenda's assistant'—essentially serving as Brenda Pippin's eyes and ears while she was out."  PRDSMF ¶ 6.

      The Court overrules Plaintiffs' qualified response.  It is true that the evidence establishes that Ms. Parker could not hire or fire, *see supra* note 5, she did not consider herself to be a manager, and she believed she had to do the training because she "was Brenda's assistant" and filled in for Ms. Pippin when she was not working.  *Parker Dep.* 32:5-14.  However, the evidence also establishes that Ms. Parker was more than just the "eyes and ears" while Ms. Pippin was out.  For example, Ms. Parker admitted that she supervised staff while Ms. Pippin was not working.  *Id.* 21:11-17.  More critically, Plaintiffs admitted that Ms. Parker participated in the annual "Supervisor Version" training, and the evidence does not controvert this point.

structure outlined in company policy.  DSMF ¶ 7; PRDSMF ¶ 7.[9]  Boulevard Motel's sexual harassment policy contained in its employee handbook required that "any supervisor who sees or hears about conduct that may constitute harassment under this policy must immediately contact the Property Manager or Sunburst Hospitality's Corporate Human Resources Department."  DSMF ¶ 8; PRDSMF ¶ 8.

Ms. Pippin and Ms. Parker each received copies of the employee handbook. DSMF ¶ 9; PRDSMF ¶ 9.  Boulevard Motel's policy entitled, "Supervisor's Role During Sexual Harassment Investigation Procedures," required Ms. Parker and Ms. Pippin to report to human resources any employee complaints about alleged harassment.  DSMF ¶ 10; PRDSMF ¶ 10.[10]  Ms. Pippin and Ms. Parker each received a copy of the policy entitled, "Supervisor's Role During Sexual Harassment Investigation Procedures."  DSMF ¶ 11; PRDSMF ¶ 11.

---

[9]     Plaintiffs submitted a qualified response on the basis that "Ms. Parker was not a supervisor. She did not have hiring, firing, or discipline authority."  PRDSMF ¶ 7.  The Court overrules Plaintiffs' qualified response.  Even though the evidence establishes that Ms. Parker could not hire, fire, or discipline housekeeping employees, this does not controvert additional record evidence that Ms. Parker had other supervisory authority, both when Ms. Pippin was not at work and perhaps when she was. As previously noted, Ms. Parker admitted that she supervised staff while Ms. Pippin was not working. *Parker Dep.* 21:11-17.  In addition, Ms. Pippin testified during her deposition that Ms. Parker participated in sexual harassment trainings that were provided for managers only, and that Ms. Parker had "[s]ome" supervisory duties.  *Pippin Dep.* 179:8-23.  Ms. Pippin did not indicate that Ms. Parker only had "some" supervisory authority when she (Ms. Pippin) was not at work.  However, viewing the evidence in the light most favorable to the Plaintiffs, the Court assumes that Ms. Parker only had "some" supervisory authority when Ms. Pippin was not at work.  Nevertheless, because the sexual harassment trainings were for managers only and Ms. Parker attended those trainings, the Court concludes that Ms. Parker had a supervisory duty to "immediately report employee complaints of sexual harassment."

[10]     Once again, Plaintiffs interposed a qualified response asserting that "Ms. Parker was not a supervisor.  She did not have hiring, firing, or discipline authority."  PRDSMF ¶ 10.  The Court overrules Plaintiffs' qualified response for the same reasons previously discussed.  *See supra* note 9.

Boulevard Motel's sexual harassment policy instructed that employees with complaints of harassment could bring them to their supervisor, the hotel manager, or human resources.  DSMF ¶ 36; PRDSMF ¶ 36.

### 3. April 21, 2010: The Alleged Sexual Harassment Incident Witnessed by Grace Parker

On or about April 21, 2010, Ms. Parker witnessed an incident between Ms. Martin and a maintenance employee, Randy Crabtree.  DSMF ¶ 14; PRDSMF ¶ 14. On that day, Ms. Parker was supervisor of the housekeeping department, including Ms. Martin, because Ms. Pippin was not at work.  DSMF ¶ 15; PRDSMF ¶ 15.[11]  Ms. Parker was in the break room when she overheard Mr. Crabtree call Ms. Martin "nipples."  DSMF ¶ 16; PRDSMF ¶ 16.

Ms. Parker then went outside with Ms. Martin and asked her if Mr. Crabtree had said what she thought she heard; Ms. Martin answered that he had.  DSMF ¶ 17; PRDSMF ¶ 17.  Ms. Martin then told Ms. Parker that Mr. Crabtree had also stated that he heard that Brazilian women have big nipples and asked Ms. Martin,

---

[11]    Plaintiffs denied Boulevard Motel's paragraph 15 in its entirety, arguing that "Ms. Parker was acting as Ms. Pippin's assistant.  She was overseeing housekeeping operations, but was not 'supervisor' insofar as supervisory authorities were not bestowed upon Ms. Parker when Ms. Pipp[i]n was absent." PRDSMF ¶ 15 (citing *Pippin Dep.* 179:20-25).  Ms. Pippin had this interchange during her deposition:

> Q.    Did you consider Grace to be a manager?
> A.    She was assistant housekeeper.
> Q.    She had supervisory duties?
> A.    Some.
> Q.    Okay.
> A.    She couldn't hire or fire.

*Pippin Dep.* 179:20-25.    This evidence does not controvert Boulevard Motel's paragraph 15. Furthermore, Boulevard Motel's record evidence in support of its paragraph 15 establishes that (1) Ms. Parker supervised housekeeping staff in Ms. Pippin's absence; (2) Ms. Parker supervised Ms. Martin in Ms. Pippin's absence; and (3) Ms. Pippin was not working on April 21, 2010.  *Parker Dep.* 21:11-17, 23:1-6, 23:11-14, 67:12-19, 157:17-19.  The Court overrules Plaintiffs' denial.

who is Brazilian, to lift her shirt and show him her nipples so he could suck them.
DSMF ¶ 18; PRDSMF ¶ 18.  Ms. Parker told Ms. Martin that she needed to document
everything and that they should go to Beth Landergren, Hotel General Manager.
DSMF ¶ 19; PRDSMF ¶ 19.  Ms. Martin responded that she wanted to wait for Ms.
Pippin to return to work so they could go to Ms. Landergren together.  DSMF ¶ 20;
PRDSMF ¶ 20.

### 4.    April 24, 2010: Brenda Pippin Returns to Work

On or about April 24, 2010, when Ms. Pippin returned to work, Ms. Parker told
Ms. Pippin that Ms. Martin had something to tell her.  DSMF ¶ 21; PRDSMF ¶ 21.
Ms. Martin, Ms. Parker and Ms. Pippin were having a lunch break when Ms. Martin
told Ms. Pippin about the incident with Mr. Crabtree.  DSMF ¶ 22; PRDSMF ¶ 22.
Ms. Pippin told Ms. Martin that they needed to go talk to Ms. Landergren.  DSMF ¶
23; PRDSMF ¶ 23.

### 5.    April 27, 2010: Brenda Pippin, Grace Parker, and Abinair Martin Speak with Beth Landergren; Ms. Landergren and Ms. Martin Report the Allegations to the Human Resources Department

On or about April 27, 2010, Ms. Pippin, Ms. Parker, and Ms. Martin went to
talk to Ms. Landergren.  DSMF ¶ 24; PRDSMF ¶ 24.  Ms. Pippin told Ms. Landergren
that Ms. Martin had an incident with Mr. Crabtree that she needed to tell to Ms.
Landergren.  DSMF ¶ 25; PRDSMF ¶ 25.  Ms. Martin then proceeded to describe to
Ms. Landergren the incident with Mr. Crabtree that had occurred on or about April
21, 2010.  DSMF ¶ 26; PRDSMF ¶ 26.

Ms. Landergren said she "would believe" Ms. Martin's allegations if they had been directed toward another employee, Michael Cox, but not Mr. Crabtree, and she initially tried to dissuade Ms. Martin from pressing the matter by claiming Mr. Crabtree "doesn't fit the profile" and commented "are you sure he wasn't joking because he jokes around with everybody," but Ms. Landergren then informed Ignacio Mello, Boulevard Motel's Human Resources Manager, about Ms. Martin's allegations. DSMF ¶ 27; PRDSMF ¶ 27;[12] PSAMF ¶ 7; DRPSAMF ¶ 7.[13]

---

[12]      Boulevard Motel's paragraph 27 originally stated: "Following this conversation, Landergren informed Ignacio Mello, Defendant's Human Resources Manager, about Martin's allegations." DSMF ¶ 27. Plaintiffs interposed a qualified response, explaining that before informing Mr. Mello of Ms. Martin's allegations, "Ms. Landergren tried to dissuade Ms. Martin from pressing the matter by claiming Mr. Crabtree was likely 'joking' and 'didn't fit the profile.'" PRDSMF ¶ 27 (citing *Pippin Dep.* 88:8; *Parker Dep.* 82:18; *Mello Dep.* 71:18-72:3; *id.* Attach. 11 *Ex.* 13 (*Conclusion of Investigation*)).
        The Court reviewed the record citations provided by Plaintiffs. Ms. Pippin testified that Ms. Landergren initially responded to Ms. Martin's allegations by stating that Mr. Crabtree "doesn't fit the profile." *Pippin Dep.* 88:8. An investigation revealed that Ms. Martin "expressed a concern that [Ms. Landergren] did not believe her and that [Ms. Landergren] allegedly made several comments that made her feel [Ms. Landergren] did not want her to proceed with her complaint as per Company Policy." *Conclusion of Investigation* at 1. This investigation also revealed that Ms. Landergren commented to Ms. Martin that Mr. Crabtree "did not fit the profile of a harasser" and inquired "are you sure he wasn't joking because he jokes around with everybody." *Id.* To provide context and to avoid the misconception that Ms. Landergren simply listened to Ms. Martin's allegations and then went immediately to Mr. Mello, the Court included these points to Boulevard Motel's paragraph 27, and deems the paragraph, as altered, admitted.
        Plaintiffs' citation to a portion of Ms. Parker's deposition is in reference to a separate harassment incident reported to Ms. Landergren regarding a different male employee named Michael Cox, all of which was unrelated to April 21, 2010, in which Ms. Landergren responded that Mr. Cox was "joking." *Parker Dep.* 80:21-82:18. The Court did not include this incident in its recitation of the facts.
[13]      Plaintiffs' paragraph 7 originally included that "Ms. Landergren told them that she did not believe them because Mr. Crabtree didn't 'fit the profile' of a harasser." PSAMF ¶ 7 (citing *Parker Dep.* 68:25-69:3). Boulevard Motel admitted that Ms. Landergren stated to Plaintiffs that Mr. Crabtree did not fit the profile of a harasser, but denied that she stated she did not believe Plaintiffs. DRPSAMF ¶ 7 (citing *Landergren Dep.* 35-39; *Mello Dep.* 89-90; *id.* Attach. 21 *Ex.* 23). Ms. Parker testified that during their meeting with Ms. Landergren, Ms. Landergren "put[] her head down and she goes, oh, you know, I would believe that if you said it was Michael, not Randy. He doesn't fit the profile." *Parker Dep.* 68:25-69:3. The Court assumes "Michael" is Michael Cox. Ms. Landergren testified several times during her deposition that she was "surprised," "very surprised" and found it "very surprising" when she heard the allegations. *Landergren Dep.* 35:25-36:4, 36:10, 38:18-19, 39:1-3. Viewing the evidence in the light most favorable to the Plaintiffs, the Court altered Plaintiffs' paragraph 7 slightly to reflect Ms. Parker's testimony, but otherwise concludes that the record evidence supports Plaintiffs' paragraph 7 and overrules Boulevard Motel's denial.

In her initial April 27, 2010 statement, Ms. Landergren reported that Ms. Martin's "husband told her that she has to report and have something done about it. Her husband feels it is disrespectful and makes her feel badly about her body." PSAMF ¶ 8; DRPSAMF ¶ 8.[14]  That same day, Ms. Landergren revised her initial statement in which she recounted her meeting with Ms. Martin, Ms. Pippin and Ms. Parker.  PSAMF ¶ 9; DRPSAMF ¶ 9.  She stated that Ms. Martin told her what Mr. Crabtree had done to her, and that she (Ms. Landergren) said Mr. Crabtree "joked around with everyone."  *Id.*  According to Ms. Landergren, Ms. Martin "immediately burst out crying" and asked why Ms. Landergren would allow this to go on so that she would have to be the one to get hurt and make a formal complaint?  *Id.*  Ms. Landergren stated that she then told Ms. Martin that Mr. Crabtree "jokes around" with everyone, and Ms. Martin was the only one who he offended.  *Id.*

Also on April 27, 2010, Ms. Parker assisted Ms. Martin in writing a statement of events to submit to Mr. Mello; Ms. Parker wrote on Ms. Martin's statement "this is written by Grace Parker because Abinair Martin cannot spell and write English very well."  PSAMF ¶ 10; DRPSAMF ¶ 10.[15]

---

[14]      Plaintiffs' paragraph 8 originally stated: "In her initial April 27, 2010 statement, Ms. Landergren claimed that it is Ms. Martin's husband, more than Ms. Martin, who wanted Mr. Crabtree's behavior addressed."  PSAMF ¶ 8 (citing *Mello Dep.* Attach. 20 *Ex.* 22).  Boulevard Motel interposed a qualified response, and quoting from the same exhibit relied upon by Plaintiffs, clarified that Ms. Landergren wrote Ms. Martin's "husband told her that she has to report and have something done about it.  Her husband feels it is disrespectful and makes her feel badly about her body."  DRPSAMF ¶ 8.  The Court adjusted the language of Plaintiffs' paragraph 8 to reflect the exact wording of Ms. Landergren's initial statement, and deems the paragraph, as altered, admitted.

[15]      Boulevard Motel submitted a qualified response, noting that Ms. Parker wrote on Ms. Martin's statement that "this is written by Grace Parker because Abinair Martin cannot spell and write English very well."  DRPSAMF ¶ 10 (citing *Mello Dep.* Attach. 25 *Ex.* 26).  The Court included this language to provide context as to why Ms. Parker assisted Ms. Martin in writing the statement of events.  The paragraph is deemed, as altered, admitted.

### 6. April 29 and 30, 2010: Beth Landergren Speaks with Randy Crabtree Regarding Abinair Martin's Allegations

On April 29, 2010, Ms. Landergren had a meeting with Mr. Crabtree in which she outlined the allegations against him and asked for his response. PSAMF ¶ 11; DRPSAMF ¶ 11. The following day, Ms. Landergren had another meeting with Mr. Crabtree to follow up on the previous day's meeting about the allegations of harassment. PSAMF ¶ 12; DRPSAMF ¶ 12.

### 7. Approximately Early May 2010: Ignacio Mello Investigates Abinair Martin's Allegations

Mr. Mello arrived at the Comfort Inn approximately one week later to further investigate Ms. Martin's allegations. DSMF ¶ 28; PRDSMF ¶ 28. While Mr. Mello was at the Comfort Inn, he interviewed witnesses and gathered statements, including meeting with Ms. Parker and Ms. Pippin. DSMF ¶ 29; PRDSMF ¶ 29. Ms. Parker told Mr. Mello what she had heard and that she had written a statement, which Boulevard Motel had requested. DSMF ¶ 30; PRDSMF ¶ 30. Ms. Pippin also provided written statements at Boulevard Motel's request. DSMF ¶ 31; PRDSMF ¶ 31. Ms. Pippin never witnessed any of the behavior described by Ms. Martin or any other sexually inappropriate behavior by Mr. Crabtree. DSMF ¶ 32; PRDSMF ¶ 32. Ms. Martin submitted a statement in Portuguese with a translation by her son. DSMF ¶ 33; PRDSMF ¶ 33.

Mr. Mello told Ms. Parker, Ms. Pippin, and Ms. Martin "not to talk about [the harassment] at all" or they "would get written up or terminated." PSAMF ¶ 14;

12

DRPSAMF ¶ 14.[16]  Mr. Mello believed Ms. Martin should not have spoken to Ms. Landergren regarding the investigation after the initial report.  PSAMF ¶ 15; DRPSAMF ¶ 15.[17]

### 8.   Beth Landergren is Removed from the Investigation Process

Ms. Landergren was told by Mr. Mello that she was not to be involved in the investigation after Ms. Martin reported to him that she felt Ms. Landergren "was biased in the investigation and was taking Randy's side."  PSAMF ¶ 16; DRPSAMF ¶ 16.

### 9.   Boulevard Motel's Investigative Findings and Subsequent Actions as a Result of Those Findings

Following the completion of the investigation, Boulevard Motel determined that Mr. Crabtree had engaged in inappropriate conduct, as did Ms. Landergren during the investigation of Mr. Crabtree's conduct, but nonetheless concluded that

---

[16]     Boulevard Motel submitted a qualified response to Plaintiffs' paragraph 14, asserting that "[t]he participants in the sexual harassment investigation were told not to discuss the investigation with anybody else to protect the privacy of everyone involved and to maintain neutrality of the investigation."  DRPSAMF ¶ 14 (citing *Mello Dep.* 100-01).  The Court overrules Boulevard Motel's qualified response.  Mr. Mello's deposition testimony does not address the assertion made by Plaintiffs' paragraph 14—that if Plaintiffs discussed the allegations, they would be written up or terminated.

    Also, it should be noted that Plaintiffs' paragraph 14 originally stated that Ms. Parker, Ms. Pippin, and Ms. Martin were told they "would get written up for termination."  PSAMF ¶ 14 (citing *Parker Dep.* Attachs. 16-17 *Exs.* 16-17).  A review of the exhibits, however, demonstrates they were told they "would get written up or terminated" or "written up or fired."  The Court adjusted Plaintiffs' paragraph 14 accordingly.

[17]     Plaintiffs' paragraph 15 originally stated that Mr. Mello thought Ms. Landergren should not have spoken to Ms. Martin about the investigation after the initial report.  PSAMF ¶ 15 (citing *Mello Dep.* 100-03).  Boulevard Motel submitted a qualified response, stating that Mr. Mello's testimony establishes that he did not think Ms. Martin should have spoken to "anyone, including her supervisors, following her initial report of harassment because the investigation was being conducted at the corporate level."  DRPSAMF ¶ 15 (citing *Mello Dep.* 101-02).  The Court reviewed Mr. Mello's testimony and agrees with Boulevard Motel's interpretation.  The Court adjusted Plaintiffs' paragraph 15 to reflect that Mr. Mello believed Ms. Martin should not have spoken to Ms. Landergren at this time, and deems the paragraph, as altered, admitted.

13

the incidents did not rise to the level of unlawful sexual harassment.  DSMF ¶ 34;
PRDSMF ¶ 34.[18]  In Mr. Mello's view, Boulevard Motel took prompt and remedial
action in (1) responding to Ms. Martin's allegations, (2) investigating the allegations,
and (3) issuing discipline to Mr. Crabtree, which included a finding that he "exercised
poor judgement, engaged in unprofessional and inappropriate workplace behavior,
blurred the line between supervisor and friend, and that [he] may have violated
Sunburst's sexual harassment policy," and he was provided a written warning
requiring him to complete additional harassment training.  DSMF ¶ 35; PRDSMF ¶
35.[19]

---

[18]    Boulevard Motel's paragraph 34 did not originally include any reference to its findings regarding Ms. Landergren.  DSMF ¶ 34.  Plaintiffs submitted a qualified response:

> Boulevard reprimanded Mr. Crabtree for "exercising poor judgment, engaging in unprofessional and inappropriate workplace conduct, blurring the line between supervisor and friend, and violating the hotel's sexual harassment policy." *Mello Dep.* 109:1-4, *Ex.* 35.  He was provided a written warning and required to complete additional harassment training.  *Id.*  Boulevard also determined that Ms. Landergren had engaged in inappropriate conduct during the investigation of Mr. Crabtree's conduct.  *Mello Dep.* 67:4-24, *Ex.* 13.

PRDSMF ¶ 34.

    The Court reviewed the record citations provided by Plaintiffs, and included Boulevard Motel's determination regarding Ms. Landergren, and deems the paragraph, as altered, admitted.  As for the form and substance of the reprimand received by Mr. Crabtree, the Court included this fact as regards Boulevard Motel's paragraph 35 for purposes of flow in its recitation of the facts.  *See infra* note 19.

[19]    Boulevard Motel's paragraph 35 originally stated: "Boulevard took prompt and remedial action in responding to Martin's allegations, investigating the allegations and issuing discipline to Crabtree." DSMF ¶ 35 (citing *Mello Dep.* 109-10, 115-16; *id.* Attach. 34 *Ex.* 35).  Plaintiffs made a qualified response, arguing that Boulevard Motel's paragraph 35 "is a legal conclusion."  PRDSMF ¶ 35.

    The Court disagrees that Boulevard Motel's paragraph 35 represents a legal conclusion.  During his deposition, Mr. Mello was asked whether he felt "that the hotel's response was prompt and remedial in nature," and he responded that he did.  *Mello Dep.* 116:1-3.  Besides adding to Boulevard Motel's paragraph 35 that it was Mr. Mello who was of the view that Boulevard Motel took prompt and remedial action, the Court overrules Plaintiffs' qualified response.

    In addition, to provide more information regarding the discipline Mr. Crabtree received, the Court included the form and substance of that discipline as presented by Plaintiffs in their qualified response to Boulevard Motel's paragraph 34.  *See supra* note 18.

Despite Boulevard Motel's conclusion that Mr. Crabtree's conduct violated company policy but did not rise to the level of unlawful sexual harassment, Ms. Parker and Ms. Pippin believed Mr. Crabtree's behavior to be a violation of law and company policy, as well as a health and safety risk to Ms. Martin and other employees at Comfort Inn South Portland.  PSAMF ¶ 21; DRPSAMF ¶ 21.[20]

### 10.    Brenda Pippin and Grace Parker's Understanding of Protocol and Procedure

Ms. Pippin believes that Ms. Martin should have brought her concerns about Mr. Crabtree to Ms. Pippin's attention because Ms. Pippin was her boss.  DSMF ¶ 37; PRDSMF ¶ 37.  Ms. Pippin also believes that Ms. Parker should have told Ms. Pippin about Ms. Martin's concerns because Ms. Pippin was Ms. Parker's boss.  DSMF ¶ 38; PRDSMF ¶ 38.  Ms. Pippin agrees that she should have brought Ms. Martin's report to Ms. Landergren's attention.  DSMF ¶ 39; PRDSMF ¶ 39.  Ms. Pippin agrees that the report about Mr. Crabtree's behavior was made on Ms. Martin's behalf and was Ms. Pippin's report to make.  DSMF ¶ 40; PRDSMF ¶ 40.[21]  Ms. Parker understood

---

[20]    Boulevard Motel objected to Plaintiffs' paragraph 21 on the basis that "Plaintiffs lack foundation to support their purported belief that Crabtree's behavior created a health and safety risk." DRPSAMF ¶ 21.  The Court overrules the objection.  Alternatively, Boulevard Motel interposed a qualified response, noting that Boulevard Motel concluded that Mr. Crabtree's conduct violated company policy but did not constitute unlawful sexual harassment.  *Id.*  The Court added this point to Plaintiffs' paragraph 21 to reflect that while Boulevard Motel concluded that Mr. Crabtree's conduct violated company policy but did not rise to the level of unlawful sexual harassment, Ms. Parker and Ms. Pippin believed it rose to both a violation of company policy and unlawful sexual harassment.

[21]    Boulevard Motel's paragraph 40 originally stated it was "her" report to make.  DSMF ¶ 40 (citing *Pippin Dep.* 125).  Plaintiffs denied the paragraph because "[t]he transcript cited here appears to indicate that Ms. Pippin meant that the report was Ms. Martin's, not Ms. Pippin's, "report to make." PRDSMF ¶ 40 (citing *Pippin Dep.* 125:20-24).  Although Ms. Pippin's answer was a bit confusing, the Court disagrees with Plaintiffs' interpretation.  *See Pippin Dep.* 125:18-24 ("Q. And do you agree that you should have brought it to Beth's attention?  A. I do.  With Bena [(Ms. Martin)].  Q. You wanted Bena to be there?  A. Well, it was for her, yeah.  Q. It was her report to be made?  A. Yeah").  Other than replacing the word "her" with "Ms. Pippin" to clarify who the "her" is, the Court overrules Plaintiffs' denial.

that, acting with some supervisory authority in Ms. Pippin's absence, if an employee had a problem or needed to report something like sexual harassment he or she could and should report to her.  DSMF ¶ 41; PRDSMF ¶ 41.[22]  Ms. Parker and Ms. Pippin performed their job duties as supervisors pursuant to Boulevard Motel's policies in reporting Ms. Martin's complaint of allegedly sexually harassing behavior up the chain of command.  DSMF ¶ 45; PRDSMF ¶ 45.[23]

---

[22]     Boulevard Motel's paragraph 41 originally stated: "Parker understood that, as a supervisor, if an employee had a problem or needed to report something like sexual harassment he or she could and should report to her."  DSMF ¶ 41 (citing *Parker Dep.* 157).  Plaintiffs denied the paragraph in its entirety:

> Ms. Parker's testimony was that she was a "supervisor" only insofar as she was Ms. Pippin's assistant.  She "served as supervisor when Brenda was not available" in that she was Brenda Pippin's "eyes and ears" when Ms. Pippin was not working.  *Parker Dep.* 157; *Landergren Dep.* Attach. 34 *Ex.* 39; *Parker Decl.* ¶ 4.

PRDSMF ¶ 41.

Although Ms. Parker declared that she was the "eyes and ears" when Ms. Pippin was not working, *Parker Decl.* ¶ 4, this does not tell the whole story.  During her deposition, Ms. Parker agreed that she "serve[d] as the supervisor when Brenda was not available," and agreed that when she was serving in a supervisory role, "if an employee such as Abinair Martin or any other employee had a problem or needed to report something like sexual harassment, that they could report that and should report that to [Ms. Parker]."  *Parker Dep.* 157:17-25.  Plaintiffs' citation to Exhibit 39 does not controvert this testimony.  The Court altered Boulevard Motel's paragraph 41 to reflect that an employee could and should report sexual harassment to Ms. Parker in Ms. Pippin's absence, and otherwise overrules Plaintiffs' denial.

[23]     Plaintiffs interposed a qualified response on the basis that "prior undisputed statements of fact more properly characterize what steps were taken by Pippin and Parker.  This statement improperly assumes that Ms. Parker was a supervisor, despite her lack of supervisory capacity outside of assisting Ms. Pippin."  PRDSMF ¶ 45 (citing *Parker Dep.* 21:18-22:4).  In support of its paragraph 45, Boulevard Motel cited Mr. Mello's deposition testimony in which he stated: "Parker and Pippin did their jobs as supervisors and managers in following through with reporting that complaint up the chain of command."  *Mello Dep.* 121:15-17.  It also cited Ms. Landergren's deposition testimony in which she agreed that it was Ms. Parker and Ms. Pippin's responsibility to report the incident to her.  *Landergren Dep.* 44:6-8.

As previously discussed, the evidence establishes that (1) Ms. Pippin was not working on April 21, 2010, (2) in Ms. Pippin's absence, Ms. Parker was Ms. Martin's supervisor to some extent even though she had no authority to hire, fire, or discipline her, and (3) Ms. Parker agreed that employees could and should report allegations of sexual harassment to her in Ms. Pippin's absence.  Ms. Parker also admitted that she told Ms. Martin on April 21, 2010 that they needed to report the incident to Ms. Landergren.  DSMF ¶ 19; PRDSMF ¶ 19.  The evidence establishes that Ms. Parker was following supervisors' sexual harassment training as established by Boulevard Motel.  Plaintiffs' citation to Ms. Parker's deposition testimony does not controvert this conclusion, nor provide a reasonable inference

### 11.    Randy Crabtree and Beth Landergren

Ms. Parker discussed with Ms. Martin her (Ms. Parker's) belief that Mr. Crabtree and Ms. Landergren were involved in a romantic relationship before making reports of Mr. Crabtree sexually harassing Ms. Martin.  PSAMF ¶ 4; DRPSAMF ¶ 4.  Ms. Parker heard Ms. Landergren call Mr. Crabtree "sunshine" at work.  *Id.*[24]  Ms. Parker believed Ms. Landergren and Mr. Crabtree flirted openly at work and spent personal time together outside of work.  PSAMF ¶ 5; DRPSAMF ¶ 5.[25]  Although Ms. Pippin did not know whether Ms. Landergren and Mr. Crabtree had an affair, she also heard Ms. Landergren refer to Mr. Crabtree as "sunshine" at work.  PSAMF ¶ 6;

---

otherwise.  The only reason Ms. Parker did not report the incident immediately was because Ms. Martin wanted to wait until Ms. Pippin returned to work on April 24, 2010.  DSMF ¶ 20; PRDSMF ¶ 20.  The Court overrules Plaintiffs' qualified response.

[24]    Plaintiffs' paragraph 4 originally asserted that "Ms. Parker and Ms. Martin discussed their mutual belief that Mr. Crabtree and Ms. Landergren were involved in a romantic relationship prior to making reports of Mr. Crabtree sexually harassing Ms. Martin."  PSAMF ¶ 4 (citing *Parker Decl.* ¶ 10).  Boulevard Motel objected to Plaintiffs' paragraph 4 on the basis that (1) Ms. Martin's belief, as characterized by Ms. Parker, is "inadmissible hearsay for the truth that Martin so believed," and (2) lack of foundation "to support Parker's purported belief."  DRPSAMF ¶ 4.  Boulevard Motel also denied that Ms. Landergren called Mr. Crabtree "sunshine" during work or that they were romantically involved.  *Id.* (citing *Landergren Dep.* 40, 83; *Mello Dep.* 71-72).

First, the Court sustains the hearsay objection for the reasons articulated by Boulevard Motel.  The Court adjusted Plaintiffs' paragraph 4 accordingly.  Second, the Court overrules the lack of foundation objection.  Ms. Parker stated in her affidavit that she "heard Ms. Landergren refer to Mr. Crabtree as 'sunshine' at work."  *Parker Decl.* ¶ 12.  This supports Ms. Parker's belief that Mr. Crabtree and Ms. Landergren were romantically involved.  The Court also overrules Boulevard Motel's denials.  It is true that the evidence establishes that Mr. Mello could not "verify" whether Ms. Landergren and Mr. Crabtree were romantically involved nor had he heard reference to the "sunshine" remark before his deposition, *Mello Dep.* 71:17-72:19, and Ms. Landergren denied having any romantic involvement with Mr. Crabtree or calling him "sunshine."  *Landergren Dep.* 40:5-11, 83:13-14.  Nevertheless, this evidence does not controvert Ms. Parker's belief that such a relationship existed and furthermore, the "sunshine" remark is a factual dispute, and the Court must resolve all factual disputes in favor of the Plaintiffs.

[25]    Boulevard Motel objected to Plaintiffs' paragraph 5 on the basis of lack of foundation, and denied that Ms. Landergren called Mr. Crabtree "sunshine" during work or that they were romantically involved.  DRPSAMF ¶ 5 (citing *Landergren Dep.* 40; *Mello Dep.* 71-72).  The Court overrules the objection and denial for reasons previously discussed.  *See supra* note 24.

DRPSAMF ¶ 6.[26]   In addition, Mr. Mello was aware of allegations that Ms. Landergren and Mr. Crabtree were romantically involved.  PSAMF ¶ 13; DRPSAMF ¶ 13.  Mr. Mello asked Ms. Landergren and Mr. Crabtree if there was in fact a romantic relationship; they both denied having such a relationship.  *Id.*[27]

On May 11, 2010, Ms. Landergren received Confidential Memorandum from Ned Heiss, Vice President of Operations, rebuking her for the way she handled the investigation and her inappropriate involvement therein.  PSAMF ¶ 17; DRPSAMF ¶ 17.  Mr. Crabtree also received a written reprimand from Mr. Heiss on May 11, 2010.  *Id.*[28]

### 12.    Subsequent Events in 2010

---

[26]    Plaintiffs' paragraph 6 originally said: "Although Ms. Pippin did not know whether Ms. Landergren and Mr. Crabtree had an affair, she and others on the housekeeping staff heard Ms. Landergren often refer to Mr. Crabtree as 'sunshine' at work."  PSAMF ¶ 6 (citing *Pippin Dep.* 113:22-24; *Pippin Decl.* ¶ 10; *Parker Decl.* ¶ 12).  Boulevard Motel denied the paragraph on the basis that the record evidence does not support "that 'others' heard Landergren 'often' refer to Crabtree as 'sunshine.'"  DRPSAMF ¶ 6.  The Court sustains in part and overrules in part Boulevard Motel's denial.  The Court agrees that the record evidence does not support that "others" heard the "sunshine" remark "often"; Ms. Parker also heard the remark, which the Court already included in its recitation of the facts, but it is unclear how frequently she heard it.  Likewise, it is unclear how frequently Ms. Pippin heard the remark.  However, the record evidence establishes that Ms. Pippin heard the "sunshine" remark.  The Court adjusted Plaintiffs' paragraph 6 accordingly.

[27]    Plaintiffs' paragraph 13 also originally asserted that Mr. Mello was aware of allegations that Ms. Landergren and Mr. Crabtree were romantically involved "prior to coming to Maine to begin in-person interviews with the parties involved."  PSAMF ¶ 13 (citing *Mello Dep.* 71:17-72:14).  Boulevard Motel interposed a qualified response on the basis that Mr. Mello testified that he "could not recall how, and thus when, he learned of the allegation," but otherwise admitted Plaintiffs' paragraph 13.  DRPSAMF ¶ 13.  The Court reviewed Mr. Mello's testimony, and concludes that he learned of the allegation through Ms. Pippin, Ms. Martin, or Ms. Parker's statement, but could not recall whose statement, nor did he indicate when he may have come to learn of it.  The Court omitted from Plaintiffs' paragraph 13 that he knew of the allegations before conducting in-person interviews in Maine, but deems the remainder of the paragraph, as altered, admitted.

[28]    Plaintiffs' paragraph 17 originally included that "Mr. Crabtree received a similar written reprimand from Mr. Heiss."  PSAMF ¶ 17.  Boulevard Motel interposed a qualified response, arguing that the memoranda received by Ms. Landergren and Mr. Crabtree were not "similar written reprimands" because "each addressed different misconduct."  DRPSAMF ¶ 17.  The Court adjusted Plaintiffs' paragraph 17 to reflect this point, and deems the paragraph, as altered, admitted.

On June 2, 2010, Ms. Pippin faxed a handwritten statement to Mr. Mello in which she relates Ms. Martin was still very upset, and felt that Ms. Landergren only cared about saving Mr. Crabtree. PSAMF ¶ 18; DRPSAMF ¶ 18.[29] Also on June 2, 2010, Ms. Parker faxed a statement to Mr. Mello reporting a conversation she had with Veronica Connolly, a front desk employee: "Veronica said she had a feeling that if she didn't go along with Beth about the Abinair situation that she felt like she would be fired." PSAMF ¶ 19; DRPSAMF ¶ 19.[30]

On July 8, 2010, Ms. Landergren responded to an email from Mr. Mello, in which he stated a need to hire a laundry person that would "be Supervisor (not Asst.

[29]    Boulevard Motel interposed an objection: "Pippin's portrayal of Martin's statement concerning her feelings is inadmissible hearsay and irrelevant. The statement concerns events on 5/23/10, 5/26/10, and 6/1/10 which were after the investigation into Martin's complaints." DRPSAMF ¶ 18 (citing *Mello Dep.* 78-82; *id.* Attach. 14 *Ex.* 16). The Court overrules the objection. Exhibit 16, a statement written by Ms. Pippin, could be offered as evidence that Boulevard Motel did not conduct a neutral and unbiased investigation as to the Martin-Crabtree incident. Alternatively, Boulevard Motel interposed a qualified response, claiming it is unclear who sent the fax to Mr. Mello. *Id.* The Court overrules the qualified response. On page three of Exhibit 16, Ms. Pippin signed her name, "Brenda Pippin." *Mello Dep.* Attach. 14 *Ex.* 16 at 3. Viewing the evidence in the light most favorable to the Plaintiffs, the Court concludes that the author of the statement, Ms. Pippin, was also the one who faxed the statement to Mr. Mello.

[30]    Boulevard Motel interposed a similar objection to the one it submitted regarding Ms. Pippin's statement, *see supra* note 29: "Parker's portrayal of Veronica's statement and feelings is inadmissible hearsay and irrelevant. The statement concerns events on 5/23/10, which was after the investigation into Martin's complaints." DRPSAMF ¶ 19. The Court overrules the objection for similar reasons previously discussed. *See supra* note 29. In addition, although the conversation between Ms. Parker and Ms. Connolly apparently took place on May 23, 2010 (i.e., after completion of the Martin-Crabtree investigation), the Court assumes that the "Abinair situation" referenced in the statement is synonymous with the circumstances surrounding the April 21, 2010 Martin-Crabtree incident.

Alternatively, Boulevard Motel submitted a qualified response on the bases that (1) it is unclear who sent the fax to Mr. Mello and (2) Plaintiffs did not accurately quote the statement. DRPSAMF ¶ 19 (citing *Mello Dep.* Attach. 16 *Ex.* 18). The Court sustains in part and overrules in part the qualified response. As to who sent the fax, on page one of Exhibit 18, Ms. Parker signed her name, "Grace Parker." *Mello Dep.* Attach. 16 *Ex.* 18 at 1. Viewing the evidence in the light most favorable to the Plaintiffs, the Court concludes that the author of the statement, Ms. Parker, was also the one who faxed the statement to Mr. Mello. As regards the conversation articulated by Ms. Parker between her and Ms. Connolly, the Court agrees with Boulevard Motel's corrections and the Court quoted verbatim from Ms. Parker's statement in its recitation of the facts.

Finally, for purposes of context, the Court also included in Plaintiffs' paragraph 19 that Ms. Connolly was a front desk employee. *See Mello Dep.* 79:21-23.

Exec Hskpr) on two days, pay differential on those days but that person would not have managerial privileges (no hiring or firing) but would open and close the department, inspects rooms, etc., on the days Exec[utive Housekeeper] is off." PSAMF ¶ 20; DRPSAMF ¶ 20.  Ms. Landergren's response was "Ok, that's exactly what Grace does now."  *Id.*

### 13.  2011 Incident Involving Michael Cox

In 2011, Ms. Parker witnessed another maintenance employee, Michael Cox, take his shirt off and approach the back of another housekeeper.  DSMF ¶ 42; PRDSMF ¶ 42.  Ms. Parker reported the incident to Ms. Landergren.  DSMF ¶ 43; PRDSMF ¶ 43.  Ms. Parker understood that reporting to Ms. Landergren what she had witnessed regarding Mr. Cox's actions was consistent with the policy regarding supervisor responsibility for harassment.  DSMF ¶ 44; PRDSMF ¶ 44.[31]

### 14.  Brenda Pippin and Grace Parker are Terminated in 2011

---

[31]     Plaintiffs submitted a qualified response to Boulevard Motel's paragraph 44: "Ms. Parker testified that it was consistent with the policy, but not that it was consistent with her role as a supervisor."  PRDSMF ¶ 44 (citing *Parker Dep.* 157:1-5).  The following interchange took place during Ms. Parker's deposition:

> Q.     And was it your understanding that reporting to Beth what you had witnessed with Mr. Cox was consistent with the policies that we had seen earlier in a document about supervisor responsibility for harassment?
> A.     Yes.

*Parker Dep.* 156:25-157:5.  While the Court agrees with Plaintiffs that Ms. Parker did not testify that her decision to report what she saw to Ms. Landergren was "consistent with her role as a supervisor," Boulevard Motel's assertion is not contrary to that point (i.e., Boulevard Motel does not state that Ms. Parker's actions were consistent with her role as a supervisor).  Boulevard Motel's paragraph 44 is almost a verbatim recitation of what Ms. Parker agreed with during her deposition.  The Court overrules Plaintiffs' qualified response.

On or about February 23, 2011, Boulevard Motel terminated Ms. Parker's employment purportedly for a critical offense: violation of the company's ethics policy. DSMF ¶ 46; PRDSMF ¶ 46.[32]  On or about July 5, 2011, Boulevard Motel terminated Ms. Pippin's employment purportedly for an accumulation of offenses per the company's progressive discipline policy.  DSMF ¶ 47; PRDSMF ¶ 47.[33]

## II.   THE PARTIES' POSITIONS

### A.   Defendant's Motion

Boulevard Motel argues that the facts establish that Ms. Pippin and Ms. Parker, as supervisors, "had a responsibility to receive and elevate reports of alleged sexual harassment" to upper management, and having done so, neither "made any reports that would be protected under the MWPA or MHRA."  *Def.'s Mot.* at 2. Specifically, it says

> [t]heir conduct in elevating Martin's report falls into the "job duties" exception to the MWPA and MHRA, which has also been described as the "scope of employment" or "manager rule."  This exception limits the protection of anti-retaliation statutes to employees who step outside the scope of their employment duties in reporting or opposing illegal practices in a manner not dictated by the strictures of their jobs.

---

[32]   Ms. Parker admitted she was terminated on February 23, 2011, but denied the remainder of the paragraph as she claims she was terminated "in retaliation for her involvement in the investigation surrounding reports of sexual harassment."  PRDSMF ¶ 46 (citing *Parker Decl.* ¶ 14).  Although Ms. Parker's affidavit establishes she believes she was retaliated against, Ms. Parker's denial sounds more like argument than fact, not properly presented in a statement of material facts.  *Medina-Munoz v. R.J. Reynolds Tobacco Co.*, 896 F.2d 5, 8 (1st Cir. 1990) ("the nonmoving party [may not] rest[] merely upon conclusory allegations").  However, the Court included the word "purportedly" in Boulevard Motel's paragraph 46 to signal that Boulevard Motel's stated reason for terminating Ms. Parker was for violation of its ethics policy.  The Court otherwise overrules Ms. Parker's denial.

[33]   Ms. Pippin denied Boulevard Motel's paragraph 47 on the basis that it "terminated [her] employment in retaliation for her involvement in the investigation surrounding reports of sexual harassment."  PRDSMF ¶ 47 (citing *Pippin Decl.* ¶ 12).  For similar reasons previously addressed as regards Ms. Parker, the Court included the word "purportedly" in Boulevard Motel's paragraph 47, but otherwise overrules Ms. Pippin's denial.  *See supra* note 32.

*Id.* at 5.

Boulevard Motel explains that to prevail under the MWPA, Ms. Pippin and Ms. Parker each "must prove that: '(1) she engaged in activity protected by the MWPA; (2) she experienced an adverse employment action; and (3) a causal connection existed between the protected activity and the adverse employment action.'" *Id.* at 6 (quoting *Walsh v. Town of Millinocket*, 2011 ME 99, ¶ 24, 28 A.3d 610). Boulevard Motel asserts that Ms. Pippin and Ms. Parker fail under the first prong of the test articulated in *Walsh*, because the First Circuit recognized in *Winslow v. Aroostook County*, 736 F.3d 23, 32 (1st Cir. 2013) "the job duties exception to the MWPA," where the *Winslow* Court "concluded that the plaintiff had not engaged in any protected activity when she followed her supervisor's direction in reporting an alleged violation of law up the chain of command." *Def.'s Mot.* at 6-7. Boulevard Motel directs the Court's attention to several recent cases from this district that have upheld the *Winslow* holding: *Harrison v. Granite Bay Care, Inc.*, No. 2:13-cv-123-DBH, 2014 U.S. Dist. LEXIS 123668 (D. Me. June 30, 2014), *report and recommendation adopted*, 2014 U.S. Dist. LEXIS 123665 (D. Me. Sept. 4, 2014), and *Stark v. Hartt Transportation Systems*, 37 F. Supp. 3d 445 (D. Me. 2014). *Def.'s Mot.* at 7-9. It also directs the Court's attention to a recent Maine superior court case "reflecting an approach consistent with *Winslow*": *Hall v. Mid-State Machine Products*, No. 11-CV-068, 2013 Me. Super. LEXIS 169 (Sept. 4, 2013). *Def.'s Mot.* at 9. In sum, Boulevard Motel argues "[i]t was unquestionably part of both Pippin's and Parker's job responsibilities to receive Martin's report of alleged sexual harassment and to

22

immediately handle it by elevating it to the appropriate management level." *Id.* at 9-10.

Turning to the Plaintiffs' claims under the MHRA, Boulevard Motel asserts they each "must prove that she engaged in protected activity; her employer made an employment decision that adversely affected her; and that there was a causal link between the protected activity and the adverse employment action." *Id.* at 10-11 (citing *Doyle v. Dep't of Human Servs.*, 2003 ME 61, ¶ 20, 824 A.2d 48). Conceding that it has not found any caselaw from the Maine Supreme Judicial Court regarding "the scope of protection afforded by the MHRA anti-retaliation provision as applied to reports made by supervisors as part of their supervisory duties," Boulevard Motel argues that the Court should look to analogous federal law for guidance; specifically, Title VII, 42 U.S.C. § 2000e-3. *Id.* at 11 (citing *Watt v. UniFirst Corp.*, 2009 ME 47, ¶ 22 n.4, 969 A.2d 897; *Ramsdell v. Huhtamaki, Inc.*, 992 F. Supp. 2d 1, 14-15, n.19 (D. Me. 2014)). According to Boulevard Motel, while the First Circuit has not established a "manager rule" or "job duties" exception to the anti-retaliation provision under Title VII, "it has previously stated that it assumes the manager rule would apply to retaliation claims brought under Title VII." *Id.* (citing *Collazo v. Bristol-Myers Squibb Mfg., Inc.*, 617 F.3d 39 (1st Cir. 2010)). Thus, in Boulevard Motel's view, "there is little doubt that the First Circuit would extend the exception it articulated in *Winslow* to claims of retaliation under Title VII and the MHRA." *Id.* at 12.

Finally, Boulevard Motel instructs the Court to look for whether Ms. Parker or Ms. Pippin "'cross the line from being an employee performing her job . . . to an employee lodging a personal complaint.'" *Id.* (quoting *Brush v. Sears Holdings Corp.*, 466 Fed. Appx. 781, 787 (11th Cir. 2012)).  In other words, it says the "question on summary judgment is whether the undisputed material facts could allow for a reasonable inference that plaintiffs were <u>not</u> performing their jobs as supervisors when they elevated Martin's complaint, and that they had instead thrown off their supervisory mantles to pursue their own personal complaints adverse to the company." *Id.* at 12-13 (emphasis in original).  Here, it argues, "neither plaintiff can meet that burden." *Id.* at 13.  Boulevard Motel also believes that "Pippin and Parker's apparent present day belief that the company came to the wrong conclusion regarding the alleged harassment has no bearing on whether they engaged in opposition protected by the MHRA." *Id.* at 16.

## B.    Plaintiffs' Opposition

Plaintiffs disagree with Boulevard Motel's claim that Ms. Pippin and Ms. Parker are not protected under the MWPA or MHRA because they properly reported Ms. Martin's allegations "up the chain of command." *Pls.' Opp'n* at 2.  Instead, they argue that their actions remain protected pursuant to the United States Supreme Court ruling in *Crawford v. Metropolitan Government of Nashville & Davidson County, Tennessee*, 555 U.S. 271 (2009) and the First Circuit ruling in *Collazo*, and they assert that "[t]he facts of this case can easily be distinguished from the facts of

*Winslow* and align with recent state and federal decisions on protected activity." *Pls.' Opp'n* at 2.

First, Plaintiffs argue they "made several reports. Those reports – on their face – are protected under the MHRA and MWPA," and the question then is whether an exception applies. *Id.* at 9. As regards the MHRA, Plaintiffs contend there is no "job duties exception." *Id.* Directing the Court's attention to the Supreme Court ruling in *Crawford*, Plaintiffs say "[t]he Supreme Court issued a unanimous decision reversing the Sixth Circuit. It held that the anti-retaliation provision of Title VII extends to people who speak out, not just on their own initiative, but when prompted by an employer's internal investigation." *Id.* at 10. Likewise, according to Plaintiffs, in *Collazo*, the First Circuit applied *Crawford* and "reversed summary judgment, holding that a supervisor who attends HR meetings with a subordinate to support her claims of sex harassment was engaged in protected activity under the anti-retaliation provisions of Title VII." *Id.* at 11 (citing *Collazo*, 617 F.3d at 42, 49). Quoting Judge Lipez in *Collazo* for the proposition that "an employer cannot be permitted to avoid liability for retaliation under Title VII simply by crafting equal employment policies that require its employees to report unlawful employment practices," 617 F.3d at 49, Plaintiffs claim the "same analysis should apply in this case." *Pls.' Opp'n* at 11-12. In addition, they argue that "there are disputed facts regarding whether and to what extent Parker and Pippin 'stepped outside their roles' and took 'action adverse to the company.'" *Id.* at 12. Plaintiffs characterize themselves as "housekeepers" as opposed to "personnel managers" and therefore,

they were "'stepping outside their roles' as housekeepers and 'took action adverse' to the hotel." *Id.*

Turning to the job duties exception as it relates to the MWPA, Plaintiffs argue that their case is distinguishable from the one the First Circuit addressed in *Winslow*:

> Unlike the plaintiff in *Winslow*, Ms. Parker and Ms. Pippin were not making a report at the direction of their supervisor. In fact, Ms. Parker suspected her supervisor of <u>having an affair</u> with the same person accused of sexual harassment. Unlike Ms. Winslow's experience with her supervisor (who took every step to correct the violation), Plaintiffs' reports of serious sexual harassment allegations were met with immediate skepticism by Ms. Landergren. . . . Based on these facts, a reasonable jury could easily reach the conclusion that the reports were made over the *objections* of their supervisor, and therefore find that Plaintiffs "stepped outside their roles" as housekeepers and took action that was adverse to the hotel.

*Id.* at 14 (emphasis in original). Plaintiffs also contend that "Mr. Mello correctly removed [Ms. Landergren] from any part of the investigation as soon as he arrived in Maine. Ms. Landergren's inappropriate personal involvement alone distinguishes this case from *Winslow*." *Id.* at 15.

Next, Plaintiffs assert that "Ms. Parker is not a supervisor." *Id.* They say this is confirmed by the July 8, 2010 email exchange between Ms. Landergren and Mr. Mello, "in which Ms. Landergren confirms that Ms. Parker lacks 'managerial authority' and cannot hire or fire employees." *Id.* According to Plaintiffs, this is significant based on Supreme Court and First Circuit precedent, which establishes who a "supervisor" is. *Id.* (citing *Vance v. Ball State Univ.*, 133 S. Ct. 2434, 2439 (2013); *Velasquez-Perez v. Developers Diversified Realty Corp.*, 753 F.3d 265 (1st Cir. 2014)). In addition, they say that the question of "whether Ms. Parker or Ms. Pippin's

reports were part of their job duties is a question of fact." *Id.* at 16.  In short, they say "[i]t is up to the jury to determine whether the reports were protected." *Id.*

Plaintiffs also claim they made "health and safety" reports to Boulevard Motel, and therefore, "made reports that fall into both subsections 1(A) and 1(B) [of the MWPA] (protecting reports of health or safety violations, conditions, or practices)." *Id.* at 16-17 (citing *Levitt v. Sonardyne, Inc.*, 918 F. Supp. 2d 74, 88 (D. Me. 2013)). This, they say, is significant because "[t]here are sufficient grounds to conclude that a report of sexual harassment constitutes a 'health and safety' report." *Id.* at 17 (citing *Higgins v. New Balance Athletic Shoe, Inc.*, 21 F. Supp. 2d 66 (D. Me. 1998), *aff'd in relevant part*, 194 F.3d 252 (1st Cir. 1999)).  Thus, Plaintiffs conclude that if the Court were to conclude that the job duties exception applied as to their claims under subsection 1(A), their suit remains alive under subsection 1(B). *Id.*

C. **Defendant's Reply**

Boulevard Motel contends that "[n]o reasonable jury could conclude that Parker had no duty to act in accordance with [its] policies and training" regarding reports of sexual harassment. *Def.'s Reply* at 2.  It also accuses Plaintiffs of mischaracterizing the Supreme Court's ruling in *Crawford*, and says that the case "stands only for the proposition that an employee can 'oppose' unlawful discrimination within the meaning of Title VII even if the employee does not initiate the report.  It does not stand for the proposition that mere participation in an internal investigation is enough." *Id.* at 3.  Boulevard Motel argues that, similar to the plaintiff in *Brush*, "Pippin and Parker were disinterested parties to another's

complaint. They did not engage in personal opposition, but simply facilitated Martin's report to management and human resources as they were required by company policy and training." *Id.* at 4.

In addition, Boulevard Motel points out that even if subsection 1(B) of the MWPA were at play in this case (which it disputes), it says "the District of Maine has applied *Winslow* to alleged reports of unsafe conditions under subpart B of the MWPA" as well. *Id.* at 6 (citing *Stark*, 37 F. Supp. 3d 445).

## III.   LEGAL STANDARD FOR SUMMARY JUDGMENT

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). A fact is "material" if it "has the potential to change the outcome of the suit." *Tropigas de Puerto Rico, Inc. v. Certain Underwriters at Lloyd's of London*, 637 F.3d 53, 56 (1st Cir. 2011) (quoting *Borges ex rel. S.M.B.W. v. Serrano-Isern*, 605 F.3d 1, 5 (1st Cir. 2010)). A dispute is "genuine" if "a reasonable jury could resolve the point in favor of the nonmoving party." *Id.* (quoting *McCarthy v. Nw. Airlines, Inc.*, 56 F.3d 313, 315 (1st Cir. 1995)).

Once this evidence is supplied by the moving party, the nonmovant must "produce 'specific facts, in suitable evidentiary form, to . . . establish the presence of a trialworthy issue.'" *Triangle Trading Co., Inc. v. Robroy Indus., Inc.*, 200 F.3d 1, 2 (1st Cir. 1999) (quoting *Morris v. Gov't Dev. Bank of Puerto Rico*, 27 F.3d 746, 748 (1st Cir. 1994)). In other words, the non-moving party must "present 'enough competent evidence' to enable a factfinder to decide in its favor on the disputed

claims." *Carroll v. Xerox Corp.*, 294 F.3d 231, 237 (1st Cir. 2002) (quoting *Goldman v. First Nat'l Bank of Boston*, 985 F.2d 1113, 1116 (1st Cir. 1993)).

The Court then "views the facts and draws all reasonable inferences in favor of the nonmoving party." *Ophthalmic Surgeons, Ltd. v. Paychex, Inc.*, 632 F.3d 31, 35 (1st Cir. 2011). However, the Court "afford[s] no evidentiary weight to 'conclusory allegations, empty rhetoric, unsupported speculation, or evidence which, in the aggregate, is less than significantly probative.'" *Tropigas*, 637 F.3d at 56 (quoting *Rogan v. City of Boston*, 267 F.3d 24, 27 (1st Cir. 2001)); *accord Sutliffe v. Epping Sch. Dist.*, 584 F.3d 314, 325 (1st Cir. 2009).

## IV.   DISCUSSION

### A.   The Maine Whistleblower Protection Act and the Maine Human Rights Act

Under the MWPA, "[n]o employer may discharge . . . or otherwise discriminate against an employee" due to:

> A.  The employee, acting in good faith, or a person acting on behalf of the employee, reports orally or in writing to the employer or a public body what the employee has reasonable cause to believe is a violation of a law or rule adopted under the laws of this State, a political subdivision of this State or the United States;
>
> B.  The employee, acting in good faith, or a person acting on behalf of the employee, reports to the employer or a public body, orally or in writing, what the employee has reasonable cause to believe is a condition or practice that would put at risk the health or safety of that employee or any other individual. . . .

26 M.R.S. § 833(1)(A)-(B).[34]  "The Supreme Judicial Court of Maine has held that [subsection (1)(A)], when read alongside the rest of section 833, 'unambiguously limit[s] the protection afforded by the [M]WPA to (1) employees (2) who report to an employer (3) about a violation (4) committed or practiced by that employer.'" *Winslow*, 736 F.3d at 30 (quoting *Costain v. Sunbury Primary Care, P.A.*, 2008 ME 142, ¶ 8, 954 A.2d 1051).  Pursuant to the so-called *McDonnell Douglas*[35] burden-shifting framework, Plaintiffs have an "undemanding task of demonstrating a prima facie case of unlawful retaliation." *Osher v. Univ. of Maine Sys.*, 703 F. Supp. 2d 51, 64 (D. Me. 2010).  For a plaintiff to make out a prima facie case under the MWPA, she must show that "(1) she engaged in activity protected by the [M]WPA; (2) she experienced an adverse employment action; and (3) a causal connection existed between the protected activity and the adverse employment action." *Walsh*, 2011 ME 99, ¶ 24, 28 A.3d 610; *see also Tripp v. Cole*, 425 F.3d 5, 9 (1st Cir. 2005).

Similarly, under the MHRA, "[a] person may not discriminate against any individual because that individual has opposed any act or practice that is unlawful under this Act or because that individual made a charge, testified, assisted or participated in any manner in an investigation, proceeding or hearing under this Act." 5 M.R.S. § 4633(1).  As under the MWPA, Plaintiffs must first establish a prima facie case of unlawful retaliation by proving that "(1) [s]he engaged in protected conduct under the statute; (2) [s]he suffered an adverse employment action; and (3) a

---

[34]      "Although the MWPA itself provides no private right of action, complainants may, after appropriate administrative process, file a civil action under the MHRA." *Tripp v. Cole*, 425 F.3d 5, 9 n.4 (1st Cir. 2005) (citing *Schlear v. Fiber Materials, Inc.*, 574 A.2d 876, 878-79 (Me. 1990)).
[35]      *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973).

causal connection existed between the protected conduct and the adverse action." *Bishop v. Bell Atlantic Corp.*, 299 F.3d 53, 58 (1st Cir. 2002); *see also Doyle*, 2003 ME 61, ¶ 20, 824 A.2d 48.

As Boulevard Motel's contention is a narrow one—that Ms. Parker and Ms. Pippin have failed to establish the first element of their prima facie cases under both statutes because of the so-called "job duties" exception—the Court's analysis and discussion focuses exclusively on Boulevard Motel's contention under that theory.

### B.     The Job Duties or Manager Rule Exception

#### 1.     The MWPA

In *Winslow*, the plaintiff was instructed by her supervisor to email him notes she took during an exit interview, which included that federal monitors believed "it was improper for [plaintiff] to report to the County [of Aroostook]" as opposed to the Local Area I Workforce Investment Board (LWIB).  736 F.3d at 25.  Subsequently, she was instructed by her supervisor to circulate these notes to the Chairman and two co-Chief Local Elected Officials (CLEOs) of the LWIB.  *Id.*  Approximately two months later, without permission of her supervisor, the Chairman or the CLEOs, the plaintiff revealed certain information to "all of the LWIB members and 'interested parties'" via email (the "Opportunity" email), believing that revealing this information was her responsibility as Executive Director, but in her supervisor's view, she went beyond her authority and her conduct constituted insubordination. *Id.* at 26-27.

After the plaintiff's supervisor met with her to discuss her actions, *id.* at 27, the LWIB held a board meeting approximately two weeks later at which time the plaintiff was told to provide all board members with her exit interview notes. *Id.* at 28. Nearly three weeks later, after a new entity was designated fiscal agent of the LWIB to satisfy concerns of the federal monitors, plaintiff was terminated from her employment, purportedly "because the County of Aroostook will no longer be involved with the administration of this program." *Id.* at 29. Although this new entity advertised a similar position to that previously held by plaintiff and plaintiff applied for the position, she was not hired. *Id.* She filed suit under the MWPA. *Id.* Judge Singal granted the defendant's motion for summary judgment.[36] *Id.*

On appeal, the First Circuit affirmed and held that the plaintiff was not a "whistleblower" within the meaning of Maine law for several reasons. *Id.* at 31. First, "[i]t was the federal monitors who uncovered the 'violation' of the regulations, and not [plaintiff]. They also eventually published a formal report of their findings. It was the monitors who initially reported the findings to [plaintiff's supervisor]; [plaintiff] did not do so." *Id.* Second, "it was [plaintiff's supervisor] who *directed* [plaintiff] to distribute the interview notes . . . [and] [t]o the extent [plaintiff] communicated information, she did so as part of her job responsibilities, either under direct instructions from [her supervisor] or as to the 'Opportunity' email because she thought it was among her responsibilities to do so." *Id.* at 31-32 (emphasis in original). In sum, the *Winslow* Court explained that, while "there may be exceptions,

---

[36]     For Judge Singal's opinion, *see Winslow v. Cnty. of Aroostook*, No. 1:11-cv-162-GZS, 2013 U.S. Dist. LEXIS 20615 (D. Me. Feb. 15, 2013).

the usual rule in Maine is that a plaintiff's reports are not whistleblowing if it is part of his or her job responsibilities to make such reports, particularly when instructed to do so by a superior."[37]  *Id.* at 32 (citing *Capalbo v. Kris-Way Truck Leasing, Inc.*, 821 F. Supp. 2d 397, 419 (D. Me. 2011) and collecting cases from other circuits).

Courts in this district have followed *Winslow*.  For example, in *Harrison*, where the plaintiff was required under both her employer's employment policy and Maine law to make reports of suspected abuse, neglect or exploitation to her supervisor and to the Department of Health and Human Services (making her a "mandated reporter"), Magistrate Judge Rich held that these reports could not be the basis for her MWPA claim.  2014 U.S. Dist. LEXIS 123668, at *18-21.  Although she argued that making such reports were not part of her "regular job duties," *id.* at *19, the *Harrison* Court rejected this contention.  *Id.* at *19-20 ("*Winslow* cannot reasonably be read to be limited to reporting that is a 'regular' job duty").  Furthermore, the *Harrison* Court observed that the plaintiff believed it was her duty to make these reports and all employees were required to make these reports regardless of job title.[38],[39]  *Id.* at *20.

---

[37]     Although the *Winslow* Court indicated "there may be exceptions" to the job duties exception, it did not explicitly identify what those "exceptions" could be.  The Plaintiffs have not argued that their case fits within an exception under *Winslow*.

[38]     Judge Rich's report and recommendation was affirmed and adopted by Judge Hornby.  2014 U.S. Dist. LEXIS 123665 (D. Me. Sept. 4, 2014).

[39]     On September 23, 2014, Ms. Harrison filed an appeal with the First Circuit.  *Harrison v. Granite Bay Care, Inc.*, No. 14-1988.  The First Circuit heard oral argument on April 9, 2015.  During oral argument in this case on June 4, 2015, the Court asked counsel whether it should wait for a ruling from the First Circuit in *Harrison* before ruling on Boulevard Motel's pending motion.  However, counsel for both the Plaintiffs and Boulevard Motel indicated that they believed *Harrison* is inapplicable to the pending motion, especially because the primary question in *Harrison* is whether the job duties exception, as articulated in *Winslow* as regards 26 M.R.S. § 833(1), applies with equal force to reports covered under 26 M.R.S. § 833(3) (covering persons who must make reports pursuant

33

Similarly, in *Stark*, where the plaintiff was required to "report his vehicle's mechanical problems" to his employer, both in writing and orally, Magistrate Judge Rich held these reports could not form the basis of a MWPA claim.  37 F. Supp. 3d at 482.[40]  Furthermore, in *Capalbo*, cited with approval by the *Winslow* Court, the plaintiff was told "in writing and orally that he shared responsibility for monitoring his hours and that he was to notify his supervisor whenever he was in danger of violating DOT regulations regarding the maximum hours of work."  821 F. Supp. 2d at 419.  Having found that the plaintiff complied with these directives, the *Capalbo* Court held that the plaintiff's conduct was not "in opposition to an unlawful employment practice of" his employer, and thus, was "not protected activity for purposes of the MWPA."  *Id.*; *see also Hall*, 2013 Me. Super. LEXIS 169, at *19-22 ("Plaintiff cannot recover under MWPA for making a report that was within his normal job duties").

## 2.   The MHRA

Although the Court assumes that the preceding analysis regarding the job duties exception under the MWPA would apply with equal force to the anti-retaliation provision under the MHRA, the parties have not supplied and the Court could not locate caselaw from the Maine Supreme Judicial Court or First Circuit definitively declaring that the exception applies to the MHRA.  However, the Maine Supreme Judicial Court has instructed that its "construction of the MHRA and [M]WPA has

---

to 22 M.R.S. §§ 3477 or 4011-A).  Therefore, counsel preferred not to wait for a ruling from the First Circuit in *Harrison*.

[40]      Judge Rich's report and recommendation was affirmed and adopted by Judge Levy.  37 F. Supp. 3d at 448-49.

been guided by federal law."  *Currie v. Indus. Sec., Inc.*, 2007 ME 12, ¶ 13, 915 A.2d 400; *see also Watt*, 2009 ME 47, ¶ 22 n.4, 969 A.2d 897 ("It is appropriate to look to analogous federal case law for guidance in the interpretation of the Maine Human Rights Act (MHRA)").  This Court has followed suit in the past.  *See Ramsdell*, 992 F. Supp. 2d at 14 n.19 ("To the extent Plaintiff states her retaliation claim under state and federal law, the same analysis applies and the Court considers the state and federal claims concurrently without laying out a separate analysis of Plaintiff's MHRA claim"); *Green v. Maine Sch. Admin. Dist. No. 77*, 52 F. Supp. 2d 98, 109 (D. Me. 1999) ("The analytical framework used in Title VII retaliation claims applies to MHRA retaliation claims"); *Higgins*, 21 F. Supp. 2d at 72 (same).

Under Title VII, it is unlawful "for an employer to discriminate against any of his employees . . . because he has opposed any practice made an unlawful employment practice by this subchapter."  42 U.S.C. § 2000e-3(a).  In the First Circuit decision of *Collazo*, the plaintiff argued that the district court should not have granted summary judgment in favor of the defendant because he brought forth sufficient evidence "he was terminated for opposing sexual harassment in the workplace, in violation of Title VII."  617 F.3d at 45-46.  The defendant argued, among other things, that "Collazo's conduct was not protected because it was done in furtherance of his supervisory responsibilities."  *Id.* at 48 (internal quotation marks omitted).   In making this argument, the defendant relied on the First Circuit's decision in *Claudio-Gotay v. Becton Dickinson Caribe, Ltd.*, 375 F.3d 99, 102 (1st Cir. 2004).  *Collazo*, 617 F.3d at 48-49.  In *Claudio-Gotay*, the First Circuit reasoned that for a plaintiff to make out a

retaliation claim under the Fair Labor Standards Act (FLSA), "the employee must step outside his or her role of representing the company" and take "some action adverse to the company." 375 F.3d at 102 (internal quotation marks omitted). As explained by the Eleventh Circuit in the context of Title VII, "an employee must cross the line from being an employee 'performing her job . . . to an employee lodging a personal complaint.'" *Brush*, 466 Fed. Appx. at 787 (quoting *McKenzie v. Renberg's Inc.*, 94 F.3d 1478, 1486 (10th Cir. 1996)).[41]

Rather than rule on the defendant's argument definitively, the *Collazo* Court explained it "assume[s], without deciding the issue, that similar requirements apply in the Title VII context—that is, that to engage in protected conduct under Title VII's retaliation provision, an employee must step outside his ordinary employment role of representing the company and take action adverse to the company."[42] 617 F.3d at 49. Even under such an assumption, however, the First Circuit held that the plaintiff met his burden that he engaged in protected activity, particularly because he "was not a personnel manager warning his company of potential harassment claims against it; instead, he was a Senior Process Scientist assisting a subordinate employee in filing a sexual harassment complaint." *Id.* As a result, the plaintiff "'stepp[ed] outside' his normal employment role as a Senior Process Scientist and took 'action adverse to the company.'" *Id.* (quoting *Claudio-Gotay*, 375 F.3d at 102). Finally, the *Collazo* Court concluded its analysis of this issue by noting that "an

---

[41]     The *Collazo* Court cited *McKenzie* with approval.  617 F.3d at 49.
[42]     Other circuit courts have recognized such an exception. *See, e.g.*, *Brush*, 466 Fed. Appx. at 787 ("Accordingly, we find the 'manager rule' persuasive and a viable prohibition against certain individuals recovering under Title VII"); *E.E.O.C. v. HBE Corp.*, 135 F.3d 543, 554 (8th Cir. 1998).

employer cannot be permitted to avoid liability for retaliation under Title VII simply by crafting equal employment policies that require its employees to report unlawful employment practices." *Id.*

Guided by First Circuit precedent, this Court assumes that the job duties exception applies to the anti-retaliation provision of the MHRA for purposes of ruling on Boulevard Motel's motion. Thus, the Court turns to whether a genuine dispute exists as to whether Ms. Parker or Ms. Pippin were acting outside their ordinary roles and took action adverse to Boulevard Motel.

### C. Analysis

#### 1. Brenda Pippin

The evidence establishes that Ms. Pippin was the Executive Housekeeper during the events in question. She was in charge of the housekeeping department and had responsibilities relating to hiring, firing, supervising and disciplining housekeeping employees. Among those she supervised were Ms. Parker and Ms. Martin. *See* Section I.B.1, *supra*.

Like Ms. Parker, Ms. Pippin received annual training entitled, "Preventing Sexual Harassment Supervisor Version." That annual training instructed supervisors such as Ms. Pippin to immediately report employee complaints of sexual harassment according to the reporting structure outlined in company policy. Ms. Pippin received Boulevard Motel's policy entitled, "Supervisor's Role During Sexual Harassment Investigation Procedures," which required her to report to human

resources any employee complaints about alleged harassment. *See* Section I.B.2, *supra*.

On April 24, 2010, Ms. Pippin learned of the Martin-Crabtree incident from Ms. Martin. Ms. Pippin told Ms. Martin that they needed to go talk to Ms. Landergren. On April 27, 2010, Ms. Pippin told Ms. Landergren that Ms. Martin had an incident with Mr. Crabtree that she needed to bring to Ms. Landergren's attention. *See* Section I.B.4-5, *supra*. When Mr. Mello arrived at the Comfort Inn in early May 2010, he met with Ms. Pippin. Ms. Pippin also provided written statements at Boulevard Motel's request. *See* Section I.B.7, *supra*.

Ms. Pippin believes that Ms. Martin should have brought her concerns about Mr. Crabtree to Ms. Pippin's attention because Ms. Pippin was her boss. Ms. Pippin also believes that Ms. Parker should have told Ms. Pippin about Ms. Martin's concerns because Ms. Pippin was Ms. Parker's boss. Ms. Pippin agrees that she should have brought Ms. Martin's report to Ms. Landergren's attention. Furthermore, Ms. Pippin agrees that the report about Mr. Crabtree's behavior was made on Ms. Martin's behalf and was Ms. Pippin's report to make. *See* Section I.B.10, *supra*.

On June 2, 2010, Ms. Pippin faxed a handwritten statement to Mr. Mello in which she relates Ms. Martin was still very upset, and felt that Ms. Landergren only cared about saving Mr. Crabtree. *See* Section I.B.12, *supra*.

     **a.**    **The MWPA**

For Ms. Pippin to overcome the job duties exception as regards her MWPA claim, she must show there is a genuine dispute of material fact as to whether her role in reporting Ms. Martin's allegations were "part of . . . her job responsibilities to make such reports, particularly when instructed to do so by a superior." *Winslow*, 736 F.3d at 32.

Ms. Pippin argues that *Winslow* is distinguishable from the facts of this case because (1) Ms. Parker believed Ms. Landergren was having an affair with Mr. Crabtree; (2) unlike the supervisor in *Winslow*, Ms. Landergren was skeptical of Ms. Martin's allegations; and (3) "Ms. Landergren's inappropriate personal involvement alone distinguishes this case from *Winslow*." *Pls.' Opp'n* at 14-15. The Court disagrees that these facts present a difference sufficiently meaningful to distinguish *Winslow*. Even assuming Ms. Landergren was skeptical of Ms. Martin's allegations and Ms. Landergren acted inappropriately during the investigation process, these points do not affect the Court's analysis of the job duties exception.

Ms. Pippin also argues that "Ms. Parker and Ms. Pippin were not making a report at the direction of their supervisor." *Id.* at 14. Caselaw provides, however, that an employee may be required to make a report by some other mechanism, such as by an employee written policy or perhaps even by law, and need not be directed by their supervisor for the job duties exception to trigger. *See, e.g., Harrison*, 2014 U.S. Dist. LEXIS 123668, at *18-21 (all employees required to make reports to their supervisor and Department of Health and Human Services pursuant to employment policy and Maine law); *Stark*, 37 F. Supp. 3d at 481 ("It is undisputed that Stark was

39

required, pursuant to Hartt's Position Objective and Responsibilities Policy, to check his equipment daily by doing a pre-trip inspection, report any unsafe equipment or working conditions to his supervisor, and report any needed repairs or special maintenance to the Maintenance Department"); *Capalbo*, 821 F. Supp. 2d at 419 (plaintiff was told "in writing and orally that he shared responsibility for monitoring his hours and that he was to notify his supervisor whenever he was in danger of violating DOT regulations regarding the maximum hours of work").  Here, Boulevard Motel's policy clearly instructed a supervisor such as Ms. Pippin to report allegations of sexual harassment to upper management, and she admitted during her deposition that it was her job to bring Ms. Martin's complaint to Ms. Landergren's attention.  It is also factually inaccurate for Plaintiffs to claim they made no reports at the direction of their supervisor or employer.  When Mr. Mello arrived at the Comfort Inn, he met with them and gathered statements from Ms. Pippin and Ms. Parker, which had been requested by Boulevard Motel.

Even viewing the evidence in the light most favorable to Ms. Pippin, the Court concludes there is no genuine dispute of material fact that it was part of her job responsibilities to make the reports she made, and thus, summary judgment is proper as regards her MWPA claim because the job duties exception applies.  Ms. Pippin was more than just a "housekeeper."  Her initial report to Ms. Landergren was required of her under Boulevard Motel's policy entitled, "Preventing Sexual Harassment Supervisor Version."  Ms. Pippin agreed that she should have brought Ms. Martin's complaint to Ms. Landergren's attention.  *See Winslow*, 736 F.3d at 32 ("she thought

it was among her responsibilities to do so").  Her subsequent meeting with Mr. Mello and submitted statement requested of her by Boulevard Motel are no different from the plaintiff in *Winslow*.  *Id.* ("To the extent [plaintiff] communicated information, she did so as part of her job responsibilities . . . under direct instructions from [her supervisor]").

Even if Ms. Pippin's initial report was part of her job responsibilities, Ms. Pippin argues that her second report, the June 2, 2010 fax to Mr. Mello, was protected under the MWPA.  It is true that Ms. Pippin sent a fax to Mr. Mello on June 2, 2010 relaying that Ms. Martin was still upset and that Ms. Martin felt that Ms. Landergren only cared about saving Mr. Crabtree.  The chronology is important.  Ms. Pippin (along with Ms. Martin and Ms. Parker) reported the incident to Ms. Landergren on April 27, 2010.  Mr. Mello arrived at the Comfort Inn to perform his investigation on or around May 6, 2010 (one week after Ms. Landergren met with Mr. Crabtree).  Mr. Heiss, Vice President of Operations for Sunburst Hospitality Corporation, issued the results of the internal investigation on May 11, 2010.  PSAMF ¶ 17; DRPSAMF ¶ 17. It was on June 2, 2010, weeks after the May 11, 2010 investigative report, that Ms. Pippin faxed a handwritten statement to Mr. Mello saying that Ms. Martin was still upset and that Ms. Martin felt that Ms. Landergren only cared about saving Mr. Crabtree.

This chronology confirms that Ms. Pippin's fax of June 2, 2010 only reiterated that Ms. Martin was still upset and raised her view that the internal investigation was not performed properly because she felt Ms. Landergren was improperly

influencing its outcome.  Although the Court could not locate caselaw dealing with this precise question under Maine law, other courts have ruled that statements relaying criticism of an internal investigation are not "protected activity" within the meaning of Title VII.  *Brush*, 466 Fed. Appx. at 786 ("Quite simply, Brush's disagreement with the way in which Sears conducted its internal investigation into Mrs. Doe's allegations does not constitute protected activity. . . . [C]ertainly internal investigations alone do not constitute discriminatory practices"); *Entrekin v. City of Panama City, Fla.*, 376 Fed. Appx. 987, 994 (11th Cir. 2010) ("Title VII does not, however, establish requirements for an employer's internal procedures for receiving sexual harassment complaints, or even require that employers must have an internal procedure for receiving such complaints").

In *Brush*, the Eleventh Circuit observed that protected activity under Title VII represents "a plaintiff's opposition . . . to a practice made unlawful by Title VII.  Since there is no evidence of Brush's opposition to any unlawful practice here, it follows that Brush can support no claim under Title VII."  466 Fed. Appx. at 786 (internal punctuation omitted).  Likewise, to establish a prima facie case under the MWPA, Ms. Pippin needs to show that she engaged in activity protected by the MWPA.  However, as in *Brush*, to the extent she is stating in this fax either her disagreement or Ms. Martin's disagreement with the internal investigation conducted by Boulevard Motel, this is not protected activity, especially because Ms. Pippin was not the victim of the alleged harassment.  *See id.* ("Brush was neither the aggrieved nor the accused party in the underlying allegations.  Instead, she was one of the Sears employees

42

tasked with conducting the internal investigation.  As such, her claims relate not to Mrs. Doe's allegations, but instead to the procedures of the internal investigation conducted by Sears").

Ms. Pippin makes one final argument in hopes of saving her claim under the MWPA.  She says that if the Court were to conclude that her claims under subsection 1(A) are barred by the job duties exception, then it is saved under subsection 1(B) because she made "health and safety" reports to Boulevard Motel.  *Pls.' Opp'n* at 16-17.  In other words, she argues that activity that falls under subsection 1(B) is immune from the job duties exception.  *Id.* at 17.

The Court makes several observations.  First, Ms. Pippin's Complaint speaks in terms of subsection 1(A) as opposed to subsection 1(B).  *Compare Compl.* ¶ 18 ("Plaintiff, acting at all times in good faith, reported to her employer what she reasonably believed were violations of state laws or rules . . . ."), *with* 26 M.R.S. § 833(1)(A) ("The employee, acting in good faith . . . reports orally or in writing to the employer . . . what the employee has reasonable cause to believe is a violation of a law or rule adopted under the laws of this State . . . .").  There is no similar reference to subsection 1(B) in Ms. Pippin's Complaint.

Second, assuming it is proper for Ms. Pippin to raise this argument without moving to amend her Complaint, the Court nonetheless rejects her contention that the job duties exception is inapplicable.  It is true that the Court has previously recognized that subsection 1(B) "speaks in broad terms, covering any 'condition or practice that would put at risk the health or safety of [the plaintiff] or any other

43

individual.'" *Levitt*, 918 F. Supp. 2d at 88 (quoting 26 M.R.S. § 833(1)(B)).  The Court has also suggested that a plaintiff who complains "about allegedly unsafe and illegal conditions, including his harassment by other employees" may constitute protected activity within the meaning of either subsection.  *Higgins*, 21 F. Supp. 2d at 71-73 ("Many of Plaintiff's alleged complaints relate to potentially illegal or unsafe conditions and therefore may constitute protected conduct under these subsections of the MWPA cited above").  At the same time, the plaintiff in *Higgins* was complaining about alleged sexual harassment aimed at him (i.e., he was the victim of the harassment).  Furthermore, *Winslow* did not differentiate between subsections for purposes of applying the job duties exception to the MWPA, rather, it said "the usual rule in Maine is that a plaintiff's reports are not whistleblowing if it is part of his or her job responsibilities to make such reports, particularly when instructed to do so by a superior."  736 F.3d at 32.  The Court will not differentiate between subsections in concluding that the job duties exception applies to Ms. Pippin.  *See Stark*, 37 F. Supp. 3d at 484 ("Even accepting, as [plaintiff] asserts, that Hartt did not reasonably promptly correct reported mechanical deficiencies *about which he had safety concerns*, he does not demonstrate that he engaged in protected conduct for purposes of the MWPA") (emphasis added).

In sum, the Court concludes that summary judgment is proper as regards Ms. Pippin's retaliation claim under the MWPA.

### b.    The MHRA

Addressing Ms. Pippin's retaliation claim under the MHRA, as the Court assumes that Maine law would mirror federal law, including the assumption made by the *Collazo* Court that the job duties exception applies to Title VII, for Ms. Pippin to overcome the job duties exception as regards her MHRA claim, she must show there is a genuine dispute of material fact as to whether she "step[ped] outside [her] ordinary employment role of representing the company and [took] action adverse to the company." *Collazo*, 617 F.3d at 49. Said another way, she must have been acting as "an employee lodging a personal complaint." *Brush*, 466 Fed. Appx. at 787 (internal quotation marks omitted).

Ms. Pippin argues that the Supreme Court ruling in *Crawford* stands for the proposition that "the anti-retaliation provision of Title VII extends to people who speak out, not just on their own initiative, but when prompted by an employer's internal investigation." *Pls.' Opp'n* at 10. In *Crawford*, the Supreme Court considered whether the anti-retaliation provision of Title VII "extends to an employee who speaks out about discrimination not on her own initiative, but in answering questions during an employer's internal investigation." 555 U.S. at 273. In holding that it does, the *Crawford* Court rejected the Sixth Circuit's reasoning that Title VII "demands active, consistent opposing activities to warrant . . . protection against retaliation." *Id.* at 275 (internal quotation marks omitted). In sum, the *Crawford* Court stated:

> There is, then, no reason to doubt that a person can "oppose" by responding to someone else's question just as surely as by provoking the discussion, and nothing in the statute requires a freakish rule protecting an employee who reports discrimination on her own initiative but not

45

> one who reports the same discrimination in the same words when her
> boss asks a question.

*Id.* at 277-78.

*Crawford*, however, did not address the job duties exception, nor did it purport to eliminate the exception.   To the extent Ms. Pippin argues that *Crawford* extinguished the job duties exception or made it inapplicable under Title VII, the Court finds this argument unavailing.   In *Collazo*, the First Circuit relied on *Crawford* in concluding that the plaintiff "opposed" the alleged sexual harassment. 617 F.3d at 46-49.   At the same time, the First Circuit also "assume[d], without deciding the issue" that the job duties exception would apply to the anti-retaliation provision under Title VII.   *Id.* at 49.   This is significant.   There would have been no need for the First Circuit to "assume" that the job duties exception applied under Title VII if *Crawford* had done away with the exception.

Other courts have rejected Ms. Pippin's argument.   For example, in *Brush*, the Eleventh Circuit reasoned:

> Brush would have us extend *Crawford*'s reasoning not just to those
> directly impacted by workplace discrimination but to all individuals
> involved in the investigation of that discrimination, no matter how far
> distant. . . . While Brush argues that *Crawford* has foreclosed the
> "manager rule," we cannot agree.   *Crawford* pertained only to whether
> the reporting of a harassment claim was covered by Title VII where the
> reporting was solicited rather than volunteered.   It did not address
> whether a disinterested party to a harassment claim could use that
> harassment claim as its own basis for a Title VII action.   Accordingly,
> we find the "manager rule" persuasive and a viable prohibition against
> certain individuals recovering under Title VII.

466 Fed. Appx. at 787 (internal citations omitted); [43] *see also Dunn v. Wal-Mart Stores E., L.P.*, No. 1:11-cv-21756-SEITZ/SIMONTON, 2013 U.S. Dist. LEXIS 50974, at *23 (S.D. Fla. Apr. 9, 2013) ("While Plaintiff argues that the Supreme Court's decision in *Crawford* 'eviscerated' the Manager Rule, *Brush* was decided more than two years after *Crawford* and *Brush* explicitly rejected that argument").   Even though a minority of courts agree with Ms. Pippin's argument, *see, e.g., Schanfield v. Sojitz Corp. of Am.*, 663 F. Supp. 2d 305, 342 (S.D.N.Y. 2009), based on *Collazo*, the Court concludes that the First Circuit would not agree with Ms. Pippin's argument and it is the First Circuit to which this Court owes direct allegiance.[44]

Having concluded that the job duties exception still applies under Title VII notwithstanding *Crawford*, the Court concludes that even viewing the evidence in the light most favorable to Ms. Pippin, her retaliation claim under the MHRA must fail for the same reasons pertaining to her MWPA claim.   During the course of making reports to Boulevard Motel regarding the Martin-Crabtree incident, Ms. Pippin did not "step outside [her] ordinary employment role of representing" Boulevard Motel, nor did she "take action adverse to the company" within the meaning of Title VII and thus, did not do so within the meaning of the MHRA either.   *Collazo*, 617 F.3d at 49; *see also* Section IV.B.2, *supra* (discussing how courts look to analogous federal caselaw in interpreting the MHRA).

---

[43]    The *Brush* plaintiff's petition for writ of certiorari was denied by the United States Supreme Court on January 22, 2013.  *Brush v. Sears Holding Corp.*, 466 Fed. Appx. 781 (11th Cir. 2012), *cert. denied*, 133 S. Ct. 981 (2013) (No. 12-268).

[44]    To the extent Ms. Pippin also argues that *Crawford* extinguished the job duties exception as it pertains to the MWPA, the Court disagrees.

### c.     Conclusion

The Court grants Boulevard Motel's motion for summary judgment as regards Ms. Pippin's claims under the MWPA and MHRA.

### 2.     Grace Parker

The evidence establishes that Ms. Parker was the Assistant Executive Housekeeper during the events in question.  In that role, she had supervisory duties and was responsible for performing Ms. Pippin's responsibilities in Ms. Pippin's absence, including overseeing daily tasks of the housekeeping staff.  However, those responsibilities did not include the ability to hire, fire, or discipline employees.  Ms. Parker supervised Ms. Martin when Ms. Pippin was not at work, except Ms. Parker did not have the authority to fire or discipline her.  *See* Section I.B.1, *supra.*

Although Ms. Parker only had some supervisory authority during Ms. Pippin's absence, like Ms. Pippin, Ms. Parker received annual training in sexual harassment entitled, "Preventing Sexual Harassment Supervisor Version."  That training instructed supervisors such as Ms. Parker to immediately report employee complaints of sexual harassment according to the reporting structure outlined in company policy.  Ms. Parker received Boulevard Motel's policy entitled, "Supervisor's Role During Sexual Harassment Investigation Procedures," which required her to report to human resources any employee complaints about alleged harassment.  *See* Section I.B.2, *supra.*

On April 21, 2010, when Ms. Parker overheard the conversation between Ms. Martin and Mr. Crabtree, Ms. Parker was Ms. Martin's acting supervisor because

Ms. Pippin was not at work.  Ms. Parker told Ms. Martin that they should report the incident to Ms. Landergren, but Ms. Martin wanted to wait for Ms. Pippin to return to work.  When Ms. Pippin returned to work several days later, the three of them reported the incident to Ms. Landergren.  Ms. Parker assisted Ms. Martin in writing a statement of events to submit to Mr. Mello, and wrote on the statement that she was assisting Ms. Martin because Ms. Martin could not spell or write English very well.  Ms. Parker understood that, acting with some supervisory authority in Ms. Pippin's absence, Ms. Martin could and should report something like sexual harassment to her (Ms. Parker).  *See* Section I.B.3-5, 10, *supra*.

During the course of the investigation, Mr. Mello met with Ms. Parker.  Ms. Parker told Mr. Mello what she had heard and that she had written a statement, which Boulevard Motel had requested.  *See* Section I.B.7, *supra*.

Following Boulevard Motel's investigation of the Martin-Crabtree incident, on June 2, 2010, Ms. Parker faxed a statement to Mr. Mello reporting a conversation she had with Veronica Connolly, a front desk employee, reporting that Ms. Connolly feared she would be terminated if she did not go along with Ms. Landergren regarding the Martin-Crabtree incident.  In an email communication between Ms. Landergren and Mr. Mello on July 8, 2010, Mr. Mello indicated that he wanted to hire a "supervisor," not an Assistant Executive Housekeeper, with specific job duties, to which Ms. Landergren responded: "Ok, that's exactly what Grace does now."  *See* Section I.B.12, *supra*.

Finally, in 2011, Ms. Parker witnessed Mr. Cox take his shirt off and approach the back of another housekeeper.  She reported the incident to Ms. Landergren.  Ms. Parker understood that reporting to Ms. Landergren what she had witnessed regarding Mr. Cox's actions was consistent with the policy regarding supervisor responsibility for harassment.  *See* Section I.B.13, *supra*.

### a.   The MWPA

For Ms. Parker to overcome the job duties exception as regards her MWPA claim, she must show there is a genuine dispute of material fact as to whether her role in reporting Ms. Martin's allegations were "part of . . . her job responsibilities to make such reports, particularly when instructed to do so by a superior." *Winslow*, 736 F.3d at 32.

The Court previously rejected Ms. Pippin's arguments in attempting to distinguish *Winslow*, and it rejects them as to Ms. Parker with equal force.  *See* Section IV.C.1.a, *supra*.

Even viewing the evidence in the light most favorable to Ms. Parker, the Court concludes there is no genuine dispute of material fact that it was part of her job responsibilities to make the reports she made, and thus, summary judgment is proper as regards her MWPA claim because the job duties exception applies.  Ms. Parker was more than just a "housekeeper," particularly when Ms. Pippin was not at work.  Although it is true that in Ms. Pippin's absence Ms. Parker could not hire, fire, or discipline employees, she had some supervisory responsibilities.  Among those responsibilities,   the   uncontroverted   evidence   establishes   that   Ms.   Parker

participated in sexual harassment training designed specifically for supervisors or managers.  Her initial report to Ms. Landergren was required of her under Boulevard Motel's policy entitled, "Preventing Sexual Harassment Supervisor Version." Although Ms. Parker argues that this policy was inapplicable to her, she has presented no evidence that raises a genuine dispute on this point.  Indeed, the evidence bolsters the conclusion that Ms. Parker was required to make the reports she did as evidenced by (1) her telling Ms. Martin on April 21, 2010 that they needed to report the Martin-Crabtree incident to Ms. Landergren, (2) her testimony during her deposition that, in Ms. Pippin's absence, Ms. Martin could and should report something like sexual harassment to Ms. Parker, and (3) her actions in 2011 when she reported the incident involving Mr. Cox to Ms. Landergren.  Thus, the Court concludes not only that it was Ms. Parker's responsibility to make the reports she made pursuant to Boulevard Motel's policies, but also that "she thought it was among her responsibilities to do so." *Winslow*, 736 F.3d at 32.

The additional record evidence does not controvert the Court's conclusion that the job duties exception applies to Ms. Parker.  First, while it is true that Ms. Parker assisted Ms. Martin in writing a statement of events because Ms. Martin had difficulty writing English, and the statement indicated as much, this alone is insufficient to overcome the job duties exception.  Unlike the senior process scientist in *Collazo* who assisted a subordinate employee file a sexual harassment complaint, it was within Ms. Parker's job duties to report the Martin-Crabtree incident to Ms. Landergren.  Even if it was outside the scope of Ms. Parker's job duties to help Ms.

Martin write her report into English, this evidence alone is not significant enough to defeat the job duties exception.

Second, Boulevard Motel requested the statements that Ms. Parker submitted, either by interview with Mr. Mello or by written statement, and thus, the statements fall squarely within the framework articulated by the *Winslow* Court. *Winslow*, 736 F.3d at 32 ("particularly when instructed to do so by a superior").

Third, evidence of Mr. Mello's email to Ms. Landergren in July 2010 indicating that he sought to hire a "supervisor" but not an Assistant Executive Housekeeper, with specific job duties, and Ms. Landergren's response that those duties would be "exactly what [Ms. Parker] does now," does not controvert that Ms. Parker was required to make these reports.[45]

Fourth, the June 2, 2010 fax to Mr. Mello indicating that Ms. Connolly feared she would be terminated if she did not side with Ms. Landergren does not rise to "protected activity" within the meaning of the MWPA as previously explained regarding Ms. Pippin. *See* Section IV.C.1.a, *supra*.

---

[45]     Plaintiffs direct the Court to caselaw that defines "supervisor" and argue that Ms. Parker does not meet the definition. In *Vance*, the Supreme Court held that a "supervisor" under Title VII, for purposes of determining whether an employer is vicariously liable for the actions of one of its employee's unlawful harassment, is one who has been empowered by the employer "to take tangible employment actions against the victim, *i.e.*, to effect a 'significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits.'" 133 S. Ct. at 2443 (quoting *Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 761 (1998)); *see also Velazquez-Perez*, 753 F.3d at 272 ("The [Supreme] Court aimed to adopt a standard that 'can be readily applied,' and that can 'very often be resolved as a matter of law before trial'") (quoting *Vance*, 133 S. Ct. at 2449-50). Whether Ms. Parker had all of the responsibilities of a "supervisor" within the meaning of *Vance* is not critical. The key is whether "it is the employee's job to report illegality," regardless of job classification. *Kidwell v. Sybaritic, Inc.*, 784 N.W.2d 220, 228 (Minn. 2010). Here, the evidence demonstrates that one of Ms. Parker's job responsibilities was to report complaints of sexual harassment to Ms. Landergren or the Human Resources Department.

Finally, all other arguments presented by Ms. Parker that the Court has rejected as regards Ms. Pippin's MWPA claim apply with equal force as regards Ms. Parker. *See id.*

In sum, the Court concludes that summary judgment is proper as regards Ms. Parker's retaliation claim under the MWPA.

### b.    The MHRA

Turning to Ms. Parker's retaliation claim under the MHRA, as the Court assumes that Maine law would track federal law, including the assumption by the *Collazo* Court that the job duties exception applies to Title VII, for Ms. Parker to overcome the job duties exception as regards her MHRA claim, she must show there is a genuine dispute of material fact as to whether she "step[ped] outside [her] ordinary employment role of representing the company and [took] action adverse to the company." *Collazo*, 617 F.3d at 49.  Said another way, she must have been acting as "an employee lodging a personal complaint."  *Brush*, 466 Fed. Appx. at 787 (internal quotation marks omitted).

Once again, for reasons discussed in the context of the MWPA, as well as for reasons discussed regarding Ms. Pippin's MHRA claim, the Court concludes that there is no genuine dispute of material fact as to whether Ms. Parker was required in her role as Assistant Executive Housekeeper to report Ms. Martin's allegations to Ms. Landergren or if she was making a "personal complaint," including when she assisted Ms. Martin in writing a statement of events, and when she provided additional statements at the request of Boulevard Motel.  In addition, as previously

discussed, her fax to Mr. Mello was not "protected activity" within the meaning of the MHRA.

Moreover, unlike *Collazo*, where the First Circuit explained that the plaintiff met his burden in demonstrating that he engaged in protected activity, particularly because he "was not a personnel manager warning his company of potential harassment claims against it; instead, he was a Senior Process Scientist assisting a subordinate employee in filing a sexual harassment complaint," 617 F.3d at 49, Ms. Parker was a "supervisor" for purposes of sexual harassment reporting procedure, and her mere assistance with Ms. Martin's statement due to her limited English proficiency did not make Boulevard Motel's policies inapplicable to her (i.e., she did not act outside her ordinary employment role). While it is true that Boulevard Motel cannot escape liability under the MHRA "simply by crafting equal employment policies that require its employees to report unlawful employment practices," *id.*, the Court does not view Boulevard Motel's reporting policies as having such broad impact. During oral argument, counsel confirmed that the supervisor sexual harassment training provided by Boulevard Motel was for supervisors or managers only, and the evidence confirms this as well. *See supra* note 9. Ms. Parker was required to attend this training, and thus, the Court concludes that she was required to act as she did in furtherance of that training.

Finally, all other arguments presented by Ms. Parker that the Court has previously rejected as regards Ms. Pippin's MHRA claim apply with equal force as regards Ms. Parker. *See* Section IV.C.1.b, *supra*.

In sum, the Court concludes that summary judgment is proper as regards Ms. Parker's retaliation claim under the MHRA.

### c.      Conclusion

For the reasons outlined above, the Court grants Boulevard Motel's motion for summary judgment as regards Ms. Parker's claims under the MWPA and MHRA.

### 3.      *Hickson v. Vescom Corporation*

In a final attempt to save Plaintiffs' claims from the job duties exception, Plaintiffs' counsel contended during oral argument that the Maine Law Court recently suggested that the job duties exception does not apply in Maine.  In support of his position, he directed the Court's attention to *Hickson v. Vescom Corp.*, 2014 ME 27, 87 A.3d 704; *see also Pls.' Opp'n* at 17-18 (discussing *Hickson*).

In *Hickson*, the plaintiff was employed by Vescom Corporation (Vescom), which provides security services to its customers.  2014 ME 27, ¶ 3, 87 A.3d 704.  Vescom was hired to provide security to a mill in Baileyville, Maine, and the plaintiff "worked for Vescom at the mill" as a shift supervisor in charge of "both security and safety." *Id.*  In addition, Vescom adopted the mill's safety policies "verbatim, and Vescom's employees were responsible for following and enforcing those policies."  *Id.*  On July 8, 2006, the plaintiff was on duty when then-Governor John Baldacci and other state officials visited the mill; a representative from the mill accompanied the visitors as well.  *Id.* ¶ 4.  The plaintiff noticed that these visitors were not wearing proper safety gear while touring the mill, and he noted his concern in Vescom's "log book."  *Id.* Nearly three weeks later, the plaintiff sent an email on his own initiative to Governor

Baldacci "expressing his concerns about the safety issues that he noticed." *Id.* ¶ 6. The Governor's staff contacted the mill about the plaintiff's email, and after Vescom learned of the email from the mill, Vescom terminated the plaintiff's employment for, among other reasons, sending the email without first going up the chain of command at Vescom. *Id.* ¶ 7. The plaintiff sued Vescom under the MWPA and won a jury verdict against it. *Id.* ¶¶ 8, 11.

On appeal, the Maine Supreme Judicial Court in *Hickson* made no mention of the "job duties" or "manager rule" exception. Rather, Vescom argued that "it was entitled to a judgment as a matter of law because the conduct that [plaintiff] reported was not undertaken" by it (i.e., his employer), and thus, the MWPA did not apply as to Vescom. *Id.* ¶ 13. In other words, Vescom argued "that the offending conduct had to have been committed solely and directly by the employer." *Id.* ¶ 20. The Law Court upheld the jury verdict, explaining that a MWPA claim is not limited "to those reports that are exclusively related to an affirmative action of the employer. Rather, the relevant provisions of the Act require that the report must address violations, conditions, or practices that the employer has the ability and authority to correct, and those violations, conditions, or practices complained of must bear a direct relationship to the employee's current employer." *Id.*

The Court does not agree with Plaintiffs that *Hickson* eliminated or limited the job duties exception. First, the case is factually different. Hickson emailed the Governor's office on his own initiative and was terminated, in part, for failing to follow proper reporting procedures of the alleged safety issues. In contrast, Ms. Parker and

Ms. Pippin followed Boulevard Motel's procedures for reporting complaints of sexual harassment, placing them squarely within the job duties exception. Second, the Law Court did not address the job duties exception in its opinion, and this Court will not interpret *Hickson* to have done so impliedly. As this Court recently observed in another case, "too much may be made of what the Law Court did not do. Courts, especially appellate courts, typically deal with the issues the parties present, not issues they did not present." *Hearts with Haiti, Inc. v. Kendrick*, No. 2:13-cv-00039-JAW, 2015 U.S. Dist. LEXIS 74152, at *16 (D. Me. June 9, 2015).

In sum, the Court rejects Plaintiffs' contention that *Hickson* made the job duties exception inapplicable or limited under the MWPA or MHRA.

## V.   FINAL THOUGHTS

This Court is obligated to apply the teachings of the United States Supreme Court, the First Circuit Court of Appeals, and the Maine Supreme Judicial Court, as the case may be, on the legal issues before it. The doctrine of stare decisis "renders the ruling of *law* in a case binding in future cases before the same court or other courts owing obedience to the decision." *Gately v. Massachusetts*, 2 F.3d 1221, 1226 (1st Cir. 1993) (emphasis in original). Thus, this Court has applied the job duties exception to the Plaintiffs' claims and must grant summary judgment against the Plaintiffs' claims.

The Court has misgivings. However proper the job duties exception may be in whistleblower and retaliation claims in circumstances like *Winslow* where a supervisor directs an employee to file a report, the extension of the job duties

57

exception to all reports where "it is part of [an employee's] job responsibilities to make such reports," *Winslow*, 736 F.3d at 32, means that for many employees, the exception has become the rule.  Once the employer has adopted a policy requiring its employees, as here, to report instances of sexual harassment, an employee who witnesses harassment is faced with a dilemma.  If reported, as in this case, the employee gains no protection from the whistleblower and anti-retaliation laws that were enacted to protect employees who make such reports, because she was only doing her job.  Surprisingly, the employer is free to fire employees like Ms. Pippin and Ms. Parker, leaving them without recourse under either law.

By contrast, if the employee who witnessed sexual harassment had just read this opinion, she might well conclude that the wiser course is to keep quiet, fearing that if she raised a fuss, the employer could fire her.  However, if the employer found out that she was a witness and failed to report it, the employer might conclude that she violated the mandatory requirements of its reporting policy and fire her for keeping still.  Thus, the employer could fire the employee for bringing up or for not bringing up something disagreeable that has happened or is happening in the workplace and the employee's recourse would be limited.  This amounts to a classic Catch-22.[46]

Here, the Court cannot know whether Boulevard Motel truly terminated Ms. Pippin and Ms. Parker for its stated reasons or whether it fired them because they persisted in bearing unpleasant news and remained vocally disgruntled about

---

[46]    JOSEPH HELLER, CATCH-22 (1961).

Boulevard Motel's resolution, but the Court is concerned that the job duties exception has denied Ms. Pippin and Ms. Parker their day in court.  As the law becomes better defined, perhaps by this case and surely by others, the First Circuit's allusion in *Winslow* to exceptions to the job duties exception in Maine may be explicated and narrowed by either the First Circuit or, as regards Maine law, by the Maine Supreme Judicial Court so that the job duties exception becomes, as its name implies, only an exception.

## VI.   CONCLUSION

The Court GRANTS Defendant's Motion for Summary Judgment (ECF No. 32). The Court GRANTS Defendant's Motion for Summary Judgment as to Brenda Pippin (No. 2:14-cv-00167-JAW), and as to Grace Parker (No. 2:14-cv-00169-JAW).

SO ORDERED.

/s/ John A. Woodcock, Jr.
JOHN A. WOODCOCK, JR.
UNITED STATES DISTRICT JUDGE

Dated this 5th day of August, 2015